EQUIFAX SERVICES, INC., Frank W. Robinson and Paul D. Weeks

v.

Richard S. COHEN, Attorney General.

Supreme Judicial Court of Maine.

Argued Sept. 20, 1979.

Decided Sept. 9, 1980.

Bernstein, Shur, Sawyer & Nelson by Gordon F. Grimes (orally), Peter J. Rubin, Barnett I. Shur, Portland, for plaintiffs.

Peter B. Bickerman, Asst. Atty. Gen. (orally), Stanley Greenberg, Asst. Atty. Gen., Augusta, for defendant.

Before McKUSICK, C. J., and POMEROY,* WERNICK, ARCHIBALD,** GODFREY and NICHOLS, JJ.

WERNICK, Justice.

The defendant Richard S. Cohen, in his capacity as the present Attorney General of the State of Maine (substituted as party defendant in this action in place of his predecessor in office Joseph E. Brennan who was originally named as defendant), has appealed from a judgment of the Superior Court (Kennebec County) which: (1) adjudicated invalid particular provisions of the Maine Fair Credit Reporting Act (hereinafter the Maine Act), on the grounds that all of said provisions were unwarranted restraints upon constitutionally protected commercial speech and that some of them, because of their vagueness, also contravened constitutional due process of law; and (2) permanently enjoined the defendant Attorney General from enforcing the statutory provisions thus invalidated.

By a cross appeal plaintiffs Equifax Services, Inc. (Equifax), Frank Robinson and Paul Weeks contend that the judgment wrongly decided some, and erroneously failed to decide some others, of the additional attacks they made against various provisions of the Maine Act.

We deny the appeal and the cross appeal.

As we interpret the scope of the Superior Court judgment, we affirm its injunction against the enforcement of Sections 1314 and 1321 of the Act, in their original and amended versions, as adjudicating unconstitutional restraints upon commercial speech. We affirm, too, the adjudication rejecting

plaintiffs' constitutional attack, asserted in Count 5 of their amended complaint, based on the "supremacy" clause of article VI of the Constitution of the United States.

We modify the Superior Court's judgment, however, in two respects.

First, we add a clause to include an adjudication that Section 1323(2) is an unconstitutional abridgement of commercial speech insofar as it authorizes an award of additional damages for each "irrelevant" item included in a consumer report.

Second, we strike from the judgment, as determinations of constitutional issues that were made unnecessarily in that they related to the same provisions of the Maine Act the presiding Justice had otherwise invalidated, correctly we decide, as unconstitutional abridgements of commercial speech: (1) that part holding various provisions "void for vagueness" and (2) that part deciding in favor of defendant on Counts 3, 4 and 6 of plaintiffs' amended complaint which, together, alleged violations of the "commerce" clause, as well as the "due process of law" (in substantive, as distinguished from procedural, terms) and the "equal protection of the laws" clauses of the Fourteenth Amendment to the Constitution of the United States.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### I–A. Nature of the Business Involved.

The plaintiff Equifax is a Georgia Corporation authorized to do business in Maine. The plaintiff Frank Robinson was Vice–President of a region of Equifax which included Maine, and the plaintiff Paul Weeks was the manager of an Equifax office maintained in Falmouth, Maine. Equifax engages in the business of being a "consumer reporting agency", as defined in Section 1312(4) of the Maine Act[1] and in

---

* Pomeroy, J., sat at oral argument but retired prior to preparation of the opinion.

** Archibald, J., sat at oral argument but retired prior to preparation of the opinion. He joins the opinion as Active Retired Justice.

1. 10 M.R.S.A. § 1312(4) (Supp.1979–80):

   " 'Consumer reporting agency' means any person who, for monetary fees, dues or on a

the Federal Fair Credit Reporting Act, 15 U.S.C. § 1681a(f)[2] (the Federal Act). Equifax has offices all over the United States, several of which are located in Maine.

As a consumer reporting agency, Equifax gathers and sells information about individuals who have applied for credit, insurance or employment (or the like). Among the purchasers of these informational reports ("consumer reports") are insurance companies, banks and diverse kinds of employers. We refer to the purchasers of consumer reports as "users." The users need information from various sources to enable them properly to evaluate a consumer's qualifications and capacity to undertake the particular transactions involved in applications of consumers for credit, insurance coverage, employment and so forth. Approximately 80 to 85 percent of the Maine users to which Equifax has furnished consumer reports have been engaged in the business of insurance. In 1976, Equifax furnished more than 60,000 consumer reports to users in the State of Maine, and in 1977 and 1978 the volume of such reports was approximately the same.

The reports themselves vary in nature and scope, depending on the purposes for which they may be drawn. Thus, for example, the reports to life insurance companies will be in a form and have a content to assist in the underwriting of life, health and disability insurance; as furnished to fire and casualty insurers, the reports will be geared to help the underwriting of fire and casualty policies on home or automobile; as provided to employers, the reports will be formulated to be of benefit in the making of hiring decisions as to various kinds of work; and as sent to banks, reports will be formulated to be of benefit in the evaluation of applicants for loans. Equifax uses numerous printed forms containing a series of questions about consumers, the questions being devised to relate to particular transactions involved. The scope of the information may include data on a consumer's past or present employment, home environment, hobbies, health, use of alcohol or drugs, criminal record, credit record, military record, sources of income, financial stability, reputation, and so forth. In consequence of consultations between Equifax and users, the information supplied in the reports conforms very generally to areas designated by users, and various questionnaire forms are prepared and utilized to obtain the kinds of information users wish to have furnished. The process of gathering information also varies according to the purpose and nature of the consumer report. Typically, field investigators employed by Equifax compile information through personal interviews with the consumers who are the subjects of reports, through interviews with their friends, neighbors and associates and also through investigations of public records.

Although the uses to which consumer reports may be put vary according to the needs of particular users, the record before us suggests that at least in the insurance context, which encompasses the large majority of the reports furnished in Maine, the reports are used mainly to achieve a final verification of information received from other sources—such as, for example, the information acquired from insurance application forms and from the observations, or reports, or both, of insurance agents. The

---

cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports or investigative consumer reports to 3rd parties.

"For purposes of this chapter, the phrase '3rd party' shall not include an insurer to the extent consumer credit information or other information on consumers is furnished to the insurer by its own employee or licensed agent."

2. 15 U.S.C. § 1681a(f) (1974):

"(f) The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

consumer reports serve to verify and supplement data received through these other sources. Should an inconsistency appear concerning an important aspect of an application, a further investigation may be ordered either by the user or the consumer reporting agency in an effort to clarify the inconsistency. Thus, consumer reports generally serve as one, albeit an important, source of information through which users seek to obtain information to assist them in making decisions incident to the conduct of their businesses.

*I–B. The Federal Regulatory Scheme.*

It will assist us fully to understand the Maine regulatory scheme if we first examine various provisions of the Federal Act, which also regulates large parts of the consumer reporting industry as conducted in Maine.

In October, 1970, the Congress of the United States enacted the Federal Act, 15 U.S.C. §§ 1681–1681t (1974). While expressly recognizing the primacy of the value of maintaining a free flow of fair, accurate information, as well as that

> "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other infor-

mation on consumers," 15 U.S.C. § 1681(a)(3) (1974),

Congress sought to protect consumers from arbitrary, secretive reporting procedures, and inaccurate and intrusive reporting. *See* 15 U.S.C. § 1681(a)(1), (4) (1974). The regulatory scheme established by Congress includes the following provisions. It limits the purposes for which a "consumer report"[3] may be furnished, requiring that the reporting agency must reasonably believe that the user of the report has a "legitimate" business need for the information, as clarified by certain enumerated uses. *See* 15 U.S.C. § 1681b(3). For any other purpose, a reporting agency must obtain either prior consent of the subject–consumer or a court order. 15 U.S.C. § 1681b(1), (2). The Federal Act flatly prohibits the making of a consumer report containing certain dated public record information, such as a bankruptcy record over fourteen years old, or tax liens, arrest records, and any "other adverse item of information" over seven years old. 15 U.S.C. § 1681c(a)(6). Section 1681d requires that when a user requests an "investigative consumer report",[4]–a consumer report containing information relating to, among others, a consumer's charac-

---

**3.** 15 U.S.C. § 1681a(d) (1974) defines "consumer report":

"The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit·worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title. The term does not include (A) any report containing information solely as to transactions or experiences between the consumer and the person making the report; (B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device; or (C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his decision

with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made and such person makes the disclosures to the consumer required under section 1681m of this title."

**4.** 15 U.S.C. § 1681a(e) (1974) defines "investigative consumer report":

"The term 'investigative consumer report' means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. However, such informations shall not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer."

ter, general reputation or mode of living, see 15 U.S.C. § 1681a(e),–unless the report is to be used for the purpose specified in Section 1681d(a)(2), a consumer *must* be given clear, written notice that (1) such a report was requested and (2) the consumer is entitled to disclosure from the user of the "nature and scope" of the investigation. Furthermore, reporting agencies are required to establish procedures designed to keep information current, accurate, and confidential, and to disclose upon request of the consumer the substance of the information on file, (15 U.S.C. §§ 1681e, 1681g, 1681h), and to establish an investigation procedure to be followed when a consumer disputes the accuracy of any information (15 U.S.C. § 1681i). Certain users are required to notify a consumer who is denied employment, or insurance for personal, family, or household purposes, or who is denied credit or is charged more for such credit, where any such adverse decision results wholly, or partly, from information contained in a consumer report. Such notice includes the name and address of the consumer reporting firm. 15 U.S.C. § 1681m(a). Section 1681m(b) requires that users, upon request, disclose the substance of the information that resulted in adverse action. The Federal Act provides civil liability and criminal sanctions for noncompliance with its provisions. 15 U.S.C. §§ 1681n, 1681o, 1681q, 1681r. It expressly permits the states also to regulate provided that state regulation is not inconsistent with the Federal Act. 15 U.S.C. § 1681t.

*I–C.  The Maine Regulatory Scheme.*

In July 1977 the Maine legislature enacted, effective October 24, 1977, the Maine Fair Credit Reporting Act (P.L.1977, c. 514). Essentially, the Maine Act paralleled the Federal Act, except as to particular provi-

sions pertinent to the instant proceeding that we discuss later. The Maine Act was amended in 1978, effective July 6, 1978 (P.L.1977, c. 677).

In overview summary the Maine Act differs from the Federal Act as follows. It goes beyond the Federal Act in imposing stricter requirements upon reporting agencies regarding their preparation and dissemination of consumer reports. Whereas the Federal Act requires specific notice be given to a consumer before a user can procure an "investigative consumer report," the Maine Act prohibits a user from procuring such a report until prior written authorization of the consumer is obtained. 10 M.R.S.A. § 1314(1).[5] In addition, the Maine Act provides for many more absolute prohibitions against the reporting of information. Whole categories of information, such as race, religion, political affiliation and beliefs, and so forth, are classified as prohibited and to be excluded from reports. *See* 10 M.R.S.A. § 1321(1).[6] While adopting the prohibition contained in Section 1681c of the Federal Act against the inclusion of certain public record information, the Maine Act adds two more prohibited categories of public record information–relating to drug or alcohol addiction and confinement in a mental institution–and also adds entirely new sections which prohibit information concerned with race, religion, color, national ancestry (and the like). *See* 10 M.R.S.A. § 1321(1), (4). Furthermore, the Maine Act permits limited disclosures of medical information, 10 M.R.S.A. § 1315(1)(A) whereas the Federal Act excludes such information from disclosure. Maine requires that "investigative consumer reports be written", 10 M.R.S.A. § 1319(2), whereas the Federal Act allows

---

5.  10 M.R.S.A. § 1314(1) (Supp.1979–80):

> "*Notice to consumer required.* A person may not procure or cause to be prepared an investigative consumer report on any consumer unless:
>   "*A.* That person has provided the consumer with clear and conspicuous written notice of the requested procurement or preparation and the consumer has, in turn, given a signed

written authorization for each procurement or preparation; or
>   "*B.* The report is to be used in connection with an investigation of an employee by that employee's present employer involving an employment purpose for which the employee has not specifically applied."

6.  The text and substance of Section 1321 are set out at n. 12, *infra*.

them to be oral. The Maine Act fails to confer the qualified immunity given by the Federal Act relative to consumer suits against designated persons for defamation, invasion of privacy or negligence with respect to the reporting of information, cf. 15 U.S.C. § 1681h(e).

### I–D.  Procedural History.

On October 13, 1977, Equifax, and the other plaintiffs, instituted a civil action in the Superior Court (Kennebec County) against the then Attorney General of Maine, Joseph E. Brennan.  Plaintiffs sought a declaratory judgment adjudicating that certain provisions of the Maine Act, about to take effect on October 24, 1977, were unconstitutional, and plaintiffs asked that the Attorney General be permanently enjoined from enforcing such provisions of the Act as would be adjudicated unconstitutional.  When the Maine Act became effective on October 24, 1977, a temporary restraining order was issued.  It was subsequently dissolved when, on December 14, 1977, the Superior Court Justice refused to order issuance of a preliminary injunction.

As we have mentioned, amendments to the Maine Act became effective in July, 1978.  Thereafter, plaintiffs filed an amended complaint which restated their attack upon the Maine Act as it read before being amended and added further challenges to the Act in light of the amendments to it.  The defendant Attorney General moved to dismiss on grounds of mootness those paragraphs of the amended complaint challenging sections of the Act that had been repealed or modified.  The Justice denied this motion, and defendant's appeal includes an attack on the correctness of that ruling.

A hearing on the merits was held in November 1978, at which plaintiffs presented several witnesses and introduced numerous exhibits.  Defendant presented no witnesses but introduced exhibits including: (1) a

deposition of the plaintiffs Weeks and Robinson; (2) numerous examples of the forms used by Equifax in collecting and reporting information; (3) excerpts from manuals used by employees of Equifax to guide them in the preparation of reports.[7]

On the basis of the record made before him, the Superior Court Justice held unconstitutional two sections of the Maine Act in both their originally enacted and subsequently amended versions: (1) Section 1314, as requiring a consumer's prior consent before an "investigative consumer report" on him may be procured, and (2) Section 1321, as outlawing the preparation and sale of reports containing delineated categories of prohibited information.  The ground of decision was that these sections violated the First Amendment, as made binding on the States by the Fourteenth Amendment, to the Constitution of the United States.  The Superior Court Justice also adjudicated that particular prohibitions contained in Section 1321 were so vague that they could not meet the "due process of law" guaranty of the Fourteenth Amendment.

In accordance with his determinations, the Justice permanently enjoined the defendant Attorney General from enforcing those provisions of the Maine Act adjudicated unconstitutional.  The Justice either rejected, or made no decision regarding, other constitutional challenges asserted by plaintiff: challenges predicated on the due process of law, commerce clause, supremacy clause, and equal protection of the laws provisions of the federal Constitution.

From the judgment entered embodying the conclusions and actions of the Superior Court Justice, defendant has appealed to this Court.  In addition, as we stated earlier, plaintiffs have taken a cross appeal in which they attack as erroneous the Superior Court's determination of, or omission to decide, the various other constitutional issues raised.

---

**7.**  At a hearing on the motion for a preliminary injunction on November 10, 1977, defendant introduced two affidavits of one individual who had allegedly been the victim of a fake credit report prepared by Equifax.  The affidavits were introduced solely for the purposes of the preliminary injunction and apparently were not introduced at the hearing on the merits.

## II. THE FIRST–FOURTEENTH AMENDMENT PROTECTION OF SPEECH ISSUES.

### II–A. Further Details of the Decision of the Superior Court.

█ The Superior Court adjudicated originally enacted, and subsequently amended, Sections 1314 and 1321 of the Maine Act unconstitutional as a unwarranted abridgement of protections afforded commercial speech by the First–Fourteenth Amendments to the Constitution of the United States. By cross appeal the plaintiffs contend that the Court was wrong in failing to decide that Section 1313 also abridges constitutionally protected commercial speech.

In holding Section 1321 violative of the constitutional protection afforded commercial speech, the Superior Court Justice, without distinguishing among its various subsections, stated:

"where Section 1321 prohibits the reporting of certain broad categories of information in any circumstances, even with the consent of the consumer involved, the free flow of accurate public record information has been unlawfully restricted."

The adjudication is thus unclear. Did the Justice conclude that all the parts of section 1321 that purported to exclude whole categories of information are, as such, direct and unlawful restrictions of protected commercial speech even if the category of information excluded does not pertain to *public record* information; or did he decide, rather, that the entire Section 1321 scheme intrudes too extensively upon constitutionally protected speech by prohibiting the communication even of information contained in public records?

We interpret the Justice's decision as follows. It invalidated Section 1321(1), the portion of Section 1321(2) pertaining to irrelevant information, the portion of Section 1321(3) directed toward expungement of irrelevant information, and Section 1321(4)(A). The ground of invalidation was that those provisions impose unwarranted direct restrictions upon constitutionally protected commercial speech.

### II–B. The Nature and Scope of Our Appellate Review.

Before we address the merits of the contentions of the respective parties as to constitutionally protected commercial speech, we must first clarify several factors bearing upon the nature, and scope, of our appellate scrutiny of the issues raised.

We emphasize, first, that our appellate analysis will be strictly confined within the particular framework fixed by all of the parties, as well as by the adjudication of the Superior Court. One bound of that framework is that the mode of speech regulated by the Maine Act is *commercial* speech. Our appellate review thus proceeds on the basis that *in this particular case* a ground rule has been established confining our analysis to the First–Fourteenth Amendment protection of *commercial* speech. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* —— U.S. ——, ——, n. 5, 100 S.Ct. 2343, 2349, n. 5, 65 L.Ed.2d 341 (1980). For this reason, our decision of this case neither states nor intimates any opinion whatever regarding whether all the parties and the Superior Court were correct in classifying as *commercial* speech any, or all, of the modes of speech the Maine Act regulates.

Second, we regard Sections 1314 and 1321, the particular statutes held by the Superior Court to be violative of the First–Fourteenth Amendments, as direct restrictions upon speech based upon the *content* of that speech; we do not look upon them as mere time, place, or manner restrictions. *See Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York,* —— U.S. ——, ——, 100 S.Ct. 2326, 2331, 65 L.Ed.2d 319 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976); *Grayned v. City of Rockford,* 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–2303, 33 L.Ed.2d 222 (1972). The analysis will be somewhat extended to establish this point in relation to the restraint imposed by Section 1314(1),

particularly as it affects the business of the plaintiff Equifax. Without need of extended discussion, however, we find it plain that Section 1321 puts a direct content–based restraint on speech. It prohibits outright the preparation, use, or reporting of specifically defined categories of information: in (1)(A) information "[r]elative to  .  .  . race, religion, color, ancestry, ethnic origin," and so forth, and in (1)(B) information "[r]elative to an arrest or criminal charge"; in (2) information "not relevant to the purpose for which it is sought"; in (4) certain more particularly delineated information. All of these provisions of Section 1321 prohibit the reporting of the information *solely* because of the nature of its *content.*

In fuller elucidation of the nature of the restraint imposed by Section 1314(1), it might appear at first blush that its requirement that a *user* obtain prior written authorization from a consumer before procuring an investigative consumer report has only a remote relationship to the commercial speech of Equifax, which is a *supplier* of consumer reports. On the surface, the requirement seems to burden, or inconvenience, *users* rather than suppliers. Were this indeed the only practical effect of the statute, we would be reluctant to adjudicate the constitutional challenge being made here by a *supplier*—particularly in light of the United States Supreme Court's warnings that the full–blown "overbreadth" approach applied to other modes of speech may not be applicable to commercial speech. As the Supreme Court stated most recently in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, supra,* in distinguishing the "overbreadth" doctrine from the requirement that restrictions on commercial speech be "narrowly drawn":

> "The  .  .  .  [overbreadth doctrine] permits the invalidation or regulations on First Amendment grounds even when the litigant challenging the regulation has engaged in no constitutionally protected activity.  .  .  .  The overbreadth doctrine derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not

before the court and thereby escape judicial review.  .  .  .  This restraint is less likely where the expression is linked to 'commercial well–being' and therefore is not easily deterred by 'overbroad regulation.' "  *Id.,* n. 8.

*See also Bates v. State Bar of Arizona,* 433 U.S. 350, 379–82, 97 S.Ct. 2691, 2706–2708, 53 L.Ed.2d 810 (1977); *Virginia Pharmacy Board, supra,* 425 U.S. at 771, n. 24, 96 S.Ct. at 1830, n. 24; *Friedman v. Rogers,* 440 U.S. 1, 10–11, n. 9, 99 S.Ct. 887, 894–895, n. 9, 59 L.Ed.2d 100 (1979); *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 462, n. 20, 98 S.Ct. 1912, 1922, n. 20, 56 L.Ed.2d 444 (1978).

However, because of what the instant record shows is the effect of Section 1314(1) on the business of Equifax, we think it sufficiently evident that the speech restraints it imposes are not remote as against Equifax. Equifax operations in Maine are part of a nationwide consumer reporting enterprise. The record discloses that a substantial volume of Equifax's business in Maine involves users not located in Maine. Plaintiff Paul Weeks, Manager of the office maintained by Equifax in the Portland area, testified that

> "the bulk of our reports do go to customers out of the State of Maine. Most of our customers are domiciled in other states, our major life companies, major casualty companies, all types of customers."

He further testified that 25 to 30 percent of the reports made each year relate to non–residents of Maine. Whereas Maine users of consumer reports would be subject to the requirement of prior consumer consent, out–of–state users may not be thus subject to such a requirement under their own state laws. If an out–of–state user were not subject to such a restriction, and ordered either the preparation and transmission of a report or the communication of information already on file and ready to be reported by the consumer reporting agency, Equifax would be unable to respond unless and until it had first required the user to supply the requisite written consent. If Equifax did

not do this, being a Maine consumer reporting service, it would be subject to potential criminal penalties under Section 1326 of the Maine Act. The restraint could therefore translate into costly delay, and even a loss of business; indeed, the record reflects that after the Maine Act became effective, Equifax incurred some loss of business that was related to the stringency of the Act's requirements.

As brought in play in this case, then, the prior consumer consent requirement of Section 1314(1) impairs the ability of Equifax to respond effectively and promptly to requests from out–of–state users of reports. So viewed, Section 1314(1) operates as at least a prior restraint [8] and at most a total restraint on commercial speech of Equifax that may qualify for protection under the First–Fourteenth Amendments. *Cf. Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (law criminalizing newspaper's publication, without prior written approval of juvenile court lawfully obtained, of truthful information concerning name of youth charged as a juvenile offender held an impermissible prior restraint.)

Thus, Sections 1314 and 1321 are not time, place, or manner restrictions. A "constitutionally permissible time, place, or manner restriction may not be based upon either the content or subject matter of speech." *Consolidated Edison Co., supra,* ——— U.S. ———, at ———, 100 S.Ct. 2326, at 2332, 65 L.Ed.2d 319. Neither Section 1314 nor Section 1321 operates totally apart from the content of the consumer report, and under these sections it cannot be said with reasonable certainty that "alternative channels for communication" are left open. *See Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977); *Virginia Pharmacy Board, supra*, 425 U.S. at 771, 96 S.Ct. at 1830.

### II–C. The Merits of the Speech Challenges Against Particular Provisions of the Maine Act.

Having expressed these important preliminary points regarding the framework of our appellate scrutiny in this case, we address in more comprehensive detail the merits of the commercial speech issues the parties and the Superior Court have formulated for our appellate review and determination.

In its most recent decision concerning commercial speech, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, supra,* the Supreme Court of the United States has traced through all of its cases decided since *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) the developing clarification of the nature and extent of the protection of "commercial speech from unwarranted governmental regulation," conferred by the "First Amendment, as applied to the States through the Fourteenth Amendment." ——— U.S. ———, at ———, 100 S.Ct. 2343, at 2349, 65 L.Ed.2d 341. The Court summarized the results as follows:

---

8. There has been some suggestion that the doctrine of prior restraint may be inapplicable to the commercial speech area. *Virginia Pharmacy Board* stated that the "greater objectivity and hardiness" of commercial expression may permit more exacting regulation, and *"may also make inapplicable the prohibition against prior restraints."* (emphasis added) *Id.* at 771, n. 24, 96 S.Ct. at 1831, n. 24. *See also Friedman v. Rogers, supra*, 440 U.S. at 10–11, n. 9, 99 S.Ct. at 894–895, n. 9. However, we interpret this statement to signify that the Supreme Court of the United States is manifesting a degree of caution in the extent to which it carries over traditional First Amendment protections to "this uncharted area" of commercial speech. *See Id.* at 10–11, n. 9, 99 S.Ct. at 894–895, n. 9 ("[w]hen dealing with restrictions on commercial speech we frame our decision narrowly . . ."); *Beneficial Corp. v. Federal Trade Commission*, 542 F.2d 611, 620 (3rd Cir. 1976), *cert. den.* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). (The court "must start from the premise that any prior restraint is suspect, and that a remedy, even for deceptive advertising, can go no further than is necessary for the elimination of the deception.") We surmise, therefore, that the applicability of the doctrine of prior restraint to commercial speech will develop on a case by case basis, with due consideration being given to all the factors that bear upon the analysis of the *necessity* of a particular regulation as a *direct* advancement of *substantial* governmental interests.

"In commercial speech cases . . . a four–part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* at ——, 100 S.Ct. at 2351.

We therefore apply this four–part analysis to those provisions of the Maine Act challenged, here, as being a governmental regulation of commercial speech contravening First–Fourteenth Amendment protections.

### II–C–1. The Challenge to Section 1314 of the Maine Act.

The Superior Court Justice decided that the First–Fourteenth Amendment protections afforded commercial speech were violated by the provisions in Section 1314(1):

"A person may not procure or cause to be prepared an investigative consumer report on any consumer unless:

". . . That person has provided the consumer with clear and conspicuous written notice of the requested procurement or preparation and the consumer has, in turn, given or signed written authorization for each procurement or preparation . . . ."

The "investigative consumer report" for which the user must arrange to have this prior written consent of the consumer is defined in Section 1312(7) as

"a consumer report or portion thereof which includes information bearing on a consumer's character, general reputation, personal characteristics or mode of living which is obtained through personal interviews with neighbors, friends, or associates of the consumer or with others with whom he is acquainted or who may have

knowledge concerning any such items of information or by other means."

We have already explained that despite indirectness in the manner in which Section 1314(1) restrains commercial speech by Equifax (the indirectness being that the restraint is effectuated through conduct required of users and consumers), the restraint is nevertheless actual, substantial and content–based. Manifestly applicable, then, is the "four–part analysis" delineated in *Central Hudson Gas & Electric Corp., supra.*

We first inquire whether the commercial speech thus restrained by Section 1314(1) is such commercial speech as is constitutionally protected. *Central Hudson Gas & Electric, supra,* establishes that commercial speech which (1) is "more likely to deceive the public than to inform it," or (2) is "related to illegal activity" is excluded from First–Fourteenth Amendment protection. *Id.* at 2350.

Neither Section 1314(1) itself nor the elaboration of it provided by the definition of "investigative consumer report" says anything that refers in terms to deceptive or misleadingly inaccurate information, or that purports to confine the applicability of the restraint imposed to the reporting of such information. Yet, the defendant Attorney General contends the commercial speech regulated by Section 1314(1) must be held excluded from First–Fourteenth Amendment protections, as being "more likely to deceive . . . than to inform." Basically, the Attorney General's position is that by their very nature as aggregates of information relating to the personal characteristics of a consumer that are collected from interviews with third persons and by other means inviting highly subjective judgments, investigative reports will most of the time, if not always, be inaccurate and misleading and, therefore, should not be treated as constitutionally protected commercial speech.

We reject this argument. We cannot "presume" that inevitably, or generally, investigative consumer reports are deceptive or misleading, especially since the particular

record before us refutes any such "presumption" by its affirmative showing, unrefuted, that material inaccuracies turn up in only a small number of investigative consumer reports.[9]

We do not overlook that in *Ohralik v. Ohio State Bar Association, supra,* the Supreme Court of the United States was willing, without actual evidentiary support in that case, simply on the basis of the general literature and Federal Trade Commission reports to regard the activity there prohibited, i. e., in–person solicitation by an attorney, as "inherently conducive to overreaching and other forms of misconduct." *See Ohralik, supra,* 436 U.S. at 459, n. 23, 98 S.Ct. at 1923. *Ohralik,* however, involved conduct specially within the knowledge and expertise of the Court itself: the behavior of lawyers and the effects thereof on clients.

As to the particular information at issue in the attack on Section 1314(1), we conclude that the general body of secondary literature, or even the congressional legislative history of the Federal Act enacted in 1970, is not too helpful. This information relates to the time when the consumer reporting industry was unregulated. With the advent of tighter federal regulations in regard to reporting *methodology,* as distinguished from the informational *content* of reports,—such as requirements for notification of a report's preparation, disclosure of the substance of the report upon request,

imposition of strict requirements as to record keeping and filing, and imposition of civil and criminal liability for failure to comply with these regulations,—we cannot "presume" that the abuses present before and during the early 1970's still persist today, either nationally or in the State of Maine.

In applying the first step, then, of the *Central Hudson* four–step analysis, we conclude that constitutionally protected commercial speech[10] has been subjected under Section 1314(1) to content–based governmental restraint.

We proceed, then, to the second step: whether the restraint thus imposed by Section 1314(1) furthers a governmental interest *substantial* in nature. As *Central Hudson* says: "The State must assert a substantial interest to be achieved by restrictions on commercial speech." *Id.,* —— at U.S. ——, 100 S.Ct. at 2350.

Defendant Attorney General maintains that the governmental interest sought to be achieved by Section 1314(1) is the protection of the citizenry's enjoyment of "privacy." That this is a substantial governmental interest is illustrated, says the Attorney General, by the constitutional and tort law protections afforded "privacy."

One fundamental lesson we learn, however, from the constitutional and tort law approaches to the protection of "privacy" is that as it is used in common parlance, privacy is an elusive concept. Hence, to avoid

---

9. Mr. Ronald Marshall, Vice–President in charge of health and disability underwriting for Paul Revere Life Insurance Company, testified that less than one percent of investigative consumer reports used by his company contain erroneous information. Gaylord Paine, Senior Vice‑President of Connecticut Mutual Life Insurance Company testified that based on verification checks made by reference to other sources, his company found that it rarely receives investigative consumer reports containing inaccuracies. Furthermore, other testimony showed that disgruntled consumers who are refused insurance or charged higher premium rates usually complain or inquire, and that the process of verifying the information can reveal errors or substantiate the reported information. Evidence also indicated that out of 140,000 reports issued in the period from June 1974 to December 1977 in Maine, 61 consumers chal-

lenged the accuracy of the reports. Of these 61 challenges, Equifax reinvestigated 45 cases, with the results that 16 were found accurate and 29 were found to require changes in the information,—changes in items such as estimated mileage in driving to work, earned income, number of apartments in a building, or degree of alcohol use. The record also revealed that with respect to those companies whose representatives testified, approximately 95% of the applicants receive insurance at the standard rating,—a percentage tending to show that prejudicially inaccurate reporting is not extensive.

10. The Attorney General has made no contention that the commercial speech regulated by Section 1314(1) lacks constitutional protection as being "related to illegal activity."

confusion, indeed error, in analysis we must recognize that constitutional and tort law protects only *particular facets* of what the average person my think of as a "right to privacy."

For example, in those cases where government is acting in a manner claimed by a person to be violative of his "privacy", so that a constitutional claim can be made because of the presence of governmental acting, the Supreme Court of the United States has emphasized that only *particular "zones"* of privacy have constitutional protection. *See Paul v. Davis,* 424 U.S. 693, 712–13, 96 S.Ct. 1155, 1165–1166, 47 L.Ed.2d 405 (1976). In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) the "zones" of privacy constitutionally protected, because deemed fundamental or substantial, were classified as comprising generally: (1) matters so personally intimate or worthy of secrecy that government should be precluded from making, or requiring, public disclosure of them and (2) the sphere of decision–making in intimate personal matters of such importance as those "relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Id.,* at 600, n. 26, 97 S.Ct. at 877, n. 26; *see also Paul v. Davis, supra,* 424 U.S. at 713, 96 S.Ct. at 1166.

Similarly, in the law of torts *only particular* "areas" of interest comprehended within what is commonly denominated "privacy" have been marked out as legally protected. These "areas" are: (1) the interest in physical or mental solitude or seclusion, as protected from an intrusion thereon which is intentional and yields a highly offensive result; (2) the interest that certain kinds of facts about one's intimate person, or secrets, shall not be given public disclosure; (3) the interest of a person not to be falsely regarded by the public, an interest which is protected against conduct that depicts a person to the public in a false light; and (4) the interest of a person in his name or likeness, which is protected against appropriation for another's benefit or advantage. *See Nelson v. Maine Times,* Me., 373 A.2d 1221, 1223 (1977); *Estate of Berthiaume v. Pratt,* Me., 365 A.2d 792, 794 (1976); Restatement (Second), Torts § 652A–E.

It would appear, then, that the above delineated particular "zones" or "areas", as intruded upon by the particular conduct described, represent the extent of a governmental interest in protecting "privacy" that may fairly be taken as being *substantial.*

As we have already explained, the regulatory thrust of Section 1314(1) is concentrated upon *investigative* consumer reports. By definition such reports provide

"information bearing on a consumer's character, general reputation, personal characteristics or mode of living . . . obtained through personal interviews with neighbors, friends or associates of the consumer or with others with whom he is acquainted or who may have knowledge concerning any such items of information or by other means." 10 M.R.S.A. § 1312(7).

From this definition it is plain to us that the restraints imposed by Section 1314(1) safeguard only minimally and tangentially, if at all, those particular "zones" or "areas" of "privacy" (from those particular kinds of intrusions) that, as illustrated by constitutional doctrine and the law of torts, generate a governmental interest of protection that may fairly be deemed substantial. This being so, Section 1314(1) must be held unconstitutional because either: (1) the restraint it imposes really does not at all further a substantial governmental interest or (2) if we acknowledge that the restraint may have a degree of relation to a substantial governmental interest, under the third and fourth steps of the *Central Hudson* four–step analysis the restraint does not directly advance that substantial interest and is more extensive than is necessary to serve it.

### II–C–2. The Attack on Section 1321.

The Superior Court Justice decided that Section 1321 as it read in "the original and amended [Maine] [A]cts [is] . . . unconstitutional as violative of the First Amendment."

The original version of Section 1321 contained, among others, the following categories of prohibited information: "uncorrobo-

rated hearsay", "personal life style", and "philosophy." [11] The 1978 amendment deleted these categories. It also made changes pertinent to our present inquiry in other parts of Section 1321, as follows: in the Section 1321(1) prohibition of information "not reasonably relevant to the purpose for which it is sought"; in the Section 1321(2) prohibition against a consumer reporting agency's or a merchant's collection, evaluation, preparation, use or reporting of information which is "obsolete", or which either the agency or the merchant has "reason to know is inaccurate or irrelevant"; and in the Section 1321(3) requirement that consumer reporting agencies and merchants follow procedures to exclude inaccurate and irrelevant information.[12]

11. 10 M.R.S.A. § 1321(1) (Supp.1977–78) (repealed) provided:

> "*Information relative to criminal charges.* Neither a consumer reporting agency nor a merchant shall prepare, use or report information which is not reasonably relevant to the purpose for which it is sought.
>
> "Neither a consumer reporting agency nor a merchant shall collect, evaluate, prepare, use or report information relative to an arrest or a criminal charge unless there has been a criminal conviction for such offense, or information based on *uncorroborated hearsay*, or information about a consumer's race, religion, color, ancestry, ethnic origin, *personal life style, philosophy* or political affiliation, except to the extent required by governmentally imposed record keeping requirements." (emphasis added)

12. By the amendment in 1978, the full text of 10 M.R.S.A. § 1321 (Supp.1979–80) was changed to read:

"*§ 1321. Prohibited information, accuracy, relevancy and obsolescence of information in reports*

"*1. Reporting agencies.* No consumer reporting agency shall prepare, use or report information:

"*A.* Relative to a consumer's race, religion, color, ancestry, ethnic origin, sexual preference or orientation, political affiliation or political beliefs, except to the extent required by governmentally imposed record–keeping requirements or to the extent necessary to prepare, use or report information relative to an arrest or criminal charge, as provided in paragraph B, or a consumer's marital status; or

"*B.* Relative to an arrest or a criminal charge or admission of wrong doing in connection with a detention pursuant to Title 17, section 3521, unless there has been a criminal conviction for that offense or unless the charge is still pending, and, additionally, when the information reflects sexual preference or orientation, unless the conduct which is the basis of the arrest or criminal charge constitutes an offense under the provisions of the Maine Criminal Code or comparable law of another jurisdiction.

"*2. Irrelevant or inaccurate information.* A consumer reporting agency shall not prepare, use or report information which it has reason to believe is inaccurate or not relevant to the purpose for which it is sought.

"*3. Procedures to insure report accuracy.* A consumer reporting agency shall adopt and follow reasonable procedures designed to assure maximum possible accuracy of the information concerning the individual to whom the report relates and exclude from its file inaccurate information, information which cannot be verified, and information which it has . . . reason to believe is not relevant to the purpose for which it is sought.

"*4. Items prohibited in reports*

"*A.* Except as authorized under paragraph B, no consumer reporting agency may make any consumer report or investigative consumer report containing any of the following items of information:

"(1) Bankruptcies which, from date of adjudication of the most recent bankruptcy, antedate the report by more than 14 years;

"(2) Suits and judgments which from date of entry, antedate the report by more than 7 years or until the governing statute of limitations has expired, whichever is the longer period;

"(3) Paid tax liens which, from the date of payment, antedate the report by more than 7 years;

"(4) Accounts placed for collection or charged to profit and loss which antedate the report by more than 7 years;

"(5) Records of arrest or of conviction of crime which, from date of disposition, release or parole, antedate the report by more than 7 years;

"(6) Information regarding drug or alcoholic addiction unless such information is provided by a licensed practicing physician and the information relating to such addictions does not antedate the consumer report or investigative consumer report by more than 7 years;

"(7) Information relating to past confinement in a mental institution when the date of last confinement antedates the report by more than 7 years; and

"(8) Any other adverse item of information which antedates the report by more than 7 years.

Defendant Attorney General makes no contention on appeal that the Superior Court Justice committed error by deciding that parts of the original version of Section 1321 unduly restricted constitutionally protected commercial speech. Regardless of whether this omission may suggest a concession by defendant on that specific issue (and in all reasonable likelihood it does not),[13] we will nevertheless evaluate the correctness of the Justice's conclusions regarding those now repealed categories.

We are induced to do this by the nature of plaintiffs' constitutional challenge and the kinds of interests involved in this case. Plaintiffs contend that on their face the repealed parts of Section 1321 transgressed the constitutional protections afforded speech, as having restricted or chilled the compilation and reporting of information and also as having subjected consumer reporting agencies to potential civil liability and criminal penalties in the event they might have reported prohibited information at any time after the Maine Act went into effect on October 24, 1977. It may well be that as to the first ground of this facial

attack, plaintiffs are no longer subject to the direct restrictions, or any chilling effects, arising from the repealed categories of prohibited information. Yet, as to the second ground, under Sections 1322 and 1323 of the Maine Act, which condition civil liability upon a failure to comply with the Act, plaintiffs could be subjected to future suits based upon their having previously reported information prohibited by the repealed categories.[14] Since plaintiffs' challenge is facial in nature and pertains to portions of the statutes under which, despite their having been repealed, plaintiffs may still be subject to suit, and since we must in any event adjudicate the general validity of large portions of the statute that closely resemble the repealed sections in form and substance, we think we have responsibility to review the Superior Court Justice's decision in *all* of the respects that he found unconstitutional abridgments of commercial speech.

The text of Section 1321 makes evident that the bulk of its regulation is directed to the *content* of speech which, even as commercial speech, is constitutionally protected

"*B.* The provisions of paragraph A are not applicable in the case of any consumer credit report to be used in connection with:

"(1) A credit transaction involving, or which may reasonably be expected to involve, a principal amount of $50,000 or more;

"(2) The underwriting of life insurance involving, or which may reasonably be expected to involve, a face amount of $50,000 or more except that the provisions of paragraph A, subparagraphs 6 and 7 are not applicable in connection with the underwriting of life insurance involving, or which may reasonably be expected to involve, a face amount of $25,000 or more;

"(2–A) The underwriting of disability income insurance involving, or which reasonably may be expected to involve, an indemnity for total disability of $1,000 per month or more; or

"(3) The employment of any individual at an annual salary which equals, or which may reasonably be expected to equal, $20,000 or more.

"*5. Listing of denial of credit prohibited in certain situation.* No consumer reporting agency shall issue a consumer report which lists a person as having been denied credit if the sole reason for such denial is lack of sufficient information to grant credit, unless the

report states that the denial was for such reason."

**13.** We infer that defendant intended no such concession because he has so vigorously attacked on grounds of mootness the Superior Court's adjudication holding the repealed categories too vague to meet Fourteenth Amendment due process of law requirements.

**14.** We recognize that Section 1324 of the original and amended Maine Act imposes a general two year statute of limitations upon actions pertaining to any liability created under the Maine Act, and that the amendments to the Act took effect 2 years ago, on July 6, 1978. An exception to the two year period of limitation, however, keeps alive the possibility that plaintiffs could be sued under the original version of Section 1321(1). This exception applies where the consumer reporting agency, has

"materially and willfully misrepresented any information required under this Title to be disclosed to an individual and the information so misrepresented is material to the establishment of the [agency's] liability." 10 M.R.S.A. § 1324 (Supp.1979–80).

In such case, the two year period of limitation *commences* at the time the individual discovers the misrepresentations.

insofar as it is speech that is far more likely to be informative than deceptive. Section 1321(1)(A) and Section 1321(1)(B) forbid the inclusion of certain types of information, such as race, political affiliation, criminal record, *regardless* of their truth or falsity; Section 1321(4) likewise prohibits the reporting of truthful, accurate public record information.

Potentially, too, if not plainly so, the provisions in Sections 1321(2) and 1321(3) regarding the exclusion of "irrelevant" information may infringe upon constitutionally protected commercial speech, since the "irrelevance" of information does not inevitably, or with strong likelihood, cause it to be deceptive or misleading.

On the other hand, to the extent that portions of Section 1321 require information to be accurate, as in Sections 1321(2) and 1321(3), and verified, as in Section 1321(3), those provisions in terms pertain to the State's interest that commercial speech be neither deceptive nor misleading. Thus, without need for further discussion of these portions of Sections 1321(2) and 1321(3) concerned with the accuracy and truthfulness of information, we decide that, within the *commercial* speech framework in which our judicial review is proceeding, those provisions are valid regulations, as being precisely directed to such commercial speech as is excluded from constitutional protection. *Central Hudson, supra.*

To answer the question whether other particular restrictions in Section 1321 should also be upheld, on the ground that they regulate commercial speech that is excluded from constitutional protection as "relating to illegal activity", *Central Hudson, supra,* we must analyze more closely both the particular categories of prohibited information delineated in Section 1321(1)(A) and the scope and meaning of "unlawful" or "illegal" activity.

Except for several categories of prohibited information in Section 1321(1)(A), all the *other* types of information that current Section 1321 prohibits *consumer reporting agencies* from including in their reports the current Maine Act nonetheless permits the

*users* of reports to take into account in making their decisions about consumers in particular transactions. However, as the defendant Attorney General points out, reliance by *certain users* (decision makers) upon *certain* categories of information is made *independently* illegal by other statutes. For example, the Maine Human Rights Act prohibits discrimination based solely upon age, sex, race, religion, color, physical or mental handicap, ancestry, or national origin in the specific areas of credit extension, employment, housing and public accommodations.

The contention is, therefore, that the communication of information prohibited by Section 1321(1)(A) is a regulation of commercial speech lacking constitutional protection because it "relates to illegal activity" insofar as users to whom the speech is directed may use the information communicated as a basis for illegal discrimination.

We reject any such rationale to justify the suppression of commercial speech effectuated by Section 1321(1)(A). We reach this conclusion through analysis of *Pittsburgh Press Company v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), (hereinafter *"Press I"*), as it was distinguished by the Pennsylvania Supreme Court in *Commonwealth of Pennsylvania v. Pittsburgh Press Company,* 483 Pa. 314, 396 A.2d 1187 (1979), *cert. den.* 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979), hereinafter *"Press II"*).

In *Press I* the Supreme Court of the United States decided that because sex discrimination in employment was an illegal commercial activity, as defined by an independent section of the City of Pittsburgh's Human Relation Ordinance, the newspaper could be constitutionally prohibited from publishing an advertisement placed by an employer seeking applications for employment by reference to gender. In *Press II* the Pennsylvania Human Relations Commission challenged the publication by the Pittsburgh Press of "situation wanted" advertisements in which job–seekers stated their qualities in hopes of securing employ-

ment. These advertisements occasionally contained references to the race, color, religion, age and sex of the person seeking employment. The Commission argued that since discrimination on the basis of race, color, creed, ancestry, age, sex, or national origin was unlawful under the Pennsylvania Human Relations Act, the publication of "situation wanted" advertisements containing the above information was illegal activity, as violative of a provision of the Human Relations Act forbidding the aiding and abetting of unlawful discrimination. In support of this argument, the Commission cited *Press I*.

The Pennsylvania Supreme Court rejected the Commission's contention. That court saw a critical distinction between *Press I* and *Press II*. In *Press I* the newspaper was placing the prospective *employer's* advertisements in columns segregated by gender, whereas in *Press II* the newspaper published the prospective *employee's* advertisements. Thus, in *Press I* the newspaper advertising, as placed by the employer, was directly involved in the *employer's* illegal activity of hiring by reference to gender. In *Press II*, however, the newspaper's publishing of advertising placed by job–seekers could be deemed an aiding and abetting of illegally discriminatory *hiring by an employer* only if it be assumed that the mere existence of such advertising by job–seekers tended to cause employers to make illegally discriminatory hiring decisions and, therefore, that prohibiting such advertising would reduce unlawful discrimination in hiring. The Pennsylvania Supreme Court concluded that this assumption was "too speculative to justify [the] direct restriction on the advertiser's freedom of expression." *Id.*, at 1190.[15]

We think the analysis in *Press II* is correct and that its reasoning should control the case at bar. We are not persuaded that there is a distinction, here, because evidence shows that users of reports meet periodical-

ly with Equifax to discuss the general informational content of consumer reports. Such connection between Equifax and the users of its reports does not approach the symbiotic relation between the newspaper and the advertising employers in *Press I*, where the employer in every instance dictated to the newspaper the content of the advertisement. In the present case, the evidence reveals that users are consulted only occasionally by Equifax's "marketing department" regarding the general scope of the information desired.

Unlike the situation in *Press I*, nothing suggests here that users have specifically requested information falling with the narrow limits of the independently established criteria of illegal discrimination. The user's feedback relates, as far as can be discerned from the record, to general categories tailored closely to the purpose for which the report is sought. For example, life insurers request standardized types of information relating to occupation, financial status, health, and general stability; automobile insurers expect information relating to users of the automobile, driving record and habits and so forth; employers desire information relevant to the applicant's previous work experience, reliability, and so forth. Moreover, under its own internal policies, Equifax prohibits the inclusion in any report of information falling within two of the "unlawful" criteria, i. e., race and religion, except in those extremely rare circumstances where that information may have legitimate bearing on the decision to be made by a user.

We therefore conclude that the provisions in Section 1321(1)(A) cannot be sustained on the ground that the commercial speech it suppresses is excluded from constitutional protection as commercial speech "relating to illegal activity." In itself, the act of reporting the information is not illegal. Moreover, that a user merely becomes

---

**15.** This would be true particularly with respect to facts that would be readily apparent to a prospective employer from the employment application or personal interview: age, sex, race, color and so forth. As to such facts, the regulation frustrated the advertiser's freedom of expression since the employer would be likely to know in any event of the information that was prohibited from being part of an advertisement.

aware of the factors addressed by Section 1321(1)(A) is not illegal. It is only when the user bases a discriminatory decision on such factors that illegal activity occurs, and nothing in evidence shows that users are generally susceptible to improper influence merely by becoming aware of them. Hence, there is no fair basis for the "presumption" the defendant Attorney General seems to advocate, that a user's awareness of the factors delineated in Section 1321(1)(A) as the criteria for prohibiting a flow of information is the equivalent of illegal decision–making by the user.

We turn, then, to the other three steps in the *Central Hudson* "four–part analysis": whether the governmental interests asserted in support of the prohibition of constitutionally protected commercial speech required by Section 1321 are substantial, and, if so, whether the prohibitions directly advance the asserted state interests without being more extensive than necessary to serve them. For purposes of convenience and brevity, we discuss in essentially a unitary way these analytically separate inquiries that in the present context are closely interwoven.

The regulatory approach in Section 1321 manifests a governmental conception that in order to prevent intrusions upon "privacy" by unlawful discrimination and improperly influenced decision–making it is necessary to exclude entirely various items of information from the consideration of users and, therefore, to require the purging of such data from consumer agency reports.

The record in this case fails to demonstrate that such blanket exclusion from consumer agency reports of the kinds of information under scrutiny will directly advance the asserted state interests.

Except for those classes of information that other statutes make it independently illegal for users to rely upon in reaching particular kinds of decisions, Section 1321(1)(A) requires the exclusion from consumer reports of information users can *lawfully* make the basis of their decisions.[16] It would seem, too, that despite the prohibitions of Section 1321(1)(A), users can readily obtain such information through sources other than consumer agency reports.[17] Even on the assumption that recipient users may have no other ready access to the prohibited information, we cannot "presume" that their acquiring it from consumer reporting agencies would inevitably, or most likely, cause them to be prejudiced in their making of decisions. The evidence in the record before us is to the contrary.[18]

16. Although the repealed version of Section 1321 prohibited *both* the reporting of such information by the consumer reporting agency *and* the *use* of such information in economic decision making, the current Section 1321 omitted reference to the *use* of the information, thereby making it lawful unless otherwise prohibited, and focused exclusively upon the *reporting* of the information.

17. Evidence adduced in this case showed that users, particularly insurers, have multiple sources of information, including a personal application form, personal interview and an agent's evaluation. Prohibited information may come to the user's attention through such an application, by an independently solicited doctor's report, or as a result of a personal interview. *See Pittsburgh Press II, supra.* An insurance agent would not be required to obtain a consumer's prior written authorization in order to report information bearing upon that consumer's general reputation, or personal character, or mode of living. This is particularly true in regard to the *public record* information that is made a prohibited category under Section 1321(4)(A).

18. The evidence shows that insurance underwriters frequently are exposed to a range of information about a particular applicant that may or may not be relevant. If such information is not relevant to the decision at hand, but includes some of the prohibited facts, the information need not affect the judgment, for example, of a trained underwriter whose principal concern is to assess the risk that the applicant presents. Thus, Mr. Gaylord Paine, Senior Vice–President of Connecticut Mutual Life Insurance Company and an expert in the field of underwriting, testified that sexual preference or orientation alone may not be relevant to an underwriter's assessment of a particular individual risk but may be considered important and relied upon if, in combination with other information, it suggests violent or criminal tendencies. Similarly, political affiliation or beliefs will usually also be irrelevant, and be disregarded by evaluating underwriters, unless a particular application involves active partici-

In this connection, we do not overlook that Section 1321(4)(A) is substantially identical to a corresponding provision in the Federal Act. We therefore look to what appears in the Congressional legislative history as potential support for the constitutional validity of Section 1321(4)(A).

From that investigation we discern that even though Section 1321(4)(A) may further governmental interests that may be deemed to be substantial, two factors lead to the conclusion that Section 1321(4)(A) unduly abridges constitutionally protected commercial speech. The first factor is that Congress enacted the Federal Act in the early part of the 1970's, at a time when commercial speech was afforded no constitutional protection whatever. *Virginia Pharmacy Board, supra*, the first case bringing commercial speech within the protection of the First–Fourteenth Amendments, was not decided until 1976. In particular, consumer reports were then characterized as commercial speech and, therefore, as commercial speech they were held to lack constitutional protection. Now that it has been established that the fact alone that speech may be commercial does not strip away constitutional protection, Section 1321(4)(A) of the Maine Act, and its Federal Act counterpart (15 U.S.C. § 1681c), must be evaluated anew in accordance with different controlling principles.

In this reassessment, requiring closer scrutiny of the governmental restraints imposed on commercial speech, we find that the Congressional legislative history fails to

provide support for the pivotal proposition underlying Section 1321(4)(A)–the assumption that inevitably, or most probably, users of consumer reports will be improperly influenced if such reports communicate to them the type of information that Section 1321(4)(A) prohibits from inclusion in consumer reports.

The constitutional infirmity of Section 1321(4) arises, essentially, from its unduly broad sweep in going so far as to prohibit the communication of truthful, accurate facts, even those in public records, as a means of seeking to assure that decision making by users will have a proper, not an improper, basis. This governmental interest could have been adequately served had the legislature intruded less extensively upon constitutionally protected commercial speech by focusing on the decision–making process itself. For example, the Maine Act could have made it illegal for users to base their decisions on particular kinds of information, or it could have required users to provide specific justification for decisional action involving any type of information deemed "suspect." The resort to a blanket restriction, or prohibition, of constitutionally protected commercial speech thus violates the *Central Hudson* mandate that the regulatory scheme *directly advance* the asserted state interests and be *no more extensive than is necessary* to serve them.

We now address specifically those portions of the original and amended Section 1321 that purport to make "relevancy" the criterion of a category of prohibited infor-

---

pation in a violence–prone group, and in such case, depending upon the type of insurance sought, it would be material to the determination of risk. Furthermore, the record discloses that, generally, underwriters discovering adverse information in a consumer report take steps as a matter of course to verify that information by checking independent corroborating sources (such as medical reports on the application form), or by requesting a supplemental consumer report. Not only the accuracy of the reported information is checked by this procedure, but additional facts about other aspects of the applicant may corroborate an adverse inference drawn from the initial report. Lastly, cogent evidence of record shows that only in a small percentage of cases has adverse informa-

tion in a consumer report caused an outright denial of the benefit sought. For example, Frank Fowles, President of Maine Bonding & Casualty Company, formerly one of the largest customers in Maine of Equifax, testified (at the November 1977 preliminary injunction proceeding) that:

"As far as rejections are concerned, I would say that a very, very small percentage [of consumer reports cause an applicant to be denied an insurance policy]; as far as determinations about the classification of the policy leading to a need to have some adjustment in the premium, a considerably higher proportion of the policies would be in this latter category . . .."

mation. We have under consideration those parts of Section 1321 we previously mentioned at p. 201 and p. 203 of this opinion, as well as the portion of amended Section 1323(2) providing for additional damages for each reported item of information that the agency has "reason to believe was not relevant to the purpose for which it was sought."

The determination of what information is relevant in a particular instance may not be easy, or indeed possible, until all facts from all sources have been assembled and analyzed. Insurance underwriters who testified in the instant proceeding, for example, recognized that the determination of relevancy in particular circumstances may be a delicate or difficult determination. *A fortiori*, consumer reporting agencies, which only collect and report information, are even less able to differentiate in a large percentage of cases the "relevant" from the "irrelevant" information. Even the qualification added by the 1978 amendment–that the consumer reporting agency must have "reason to believe" that the information is not relevant before it will be held accountable for including it in a consumer report–is insufficient to overcome the unwarranted intrusion these provisions effectuate against constitutionally protected commercial speech. Although the chilling effect of the pre–1978 version has been relieved somewhat by the amendment, the statute's provision still sweeps broadly by use of a generalized standard which, in the context in which it is to operate, is difficult to apply. That a consumer agency may have reason to believe that an item of information might not be relevant does not establish that there is irrelevance. Moreover, even if the information may be actually irrelevant, a consumer report otherwise constitutionally protected as speech cannot be made to lose constitutional protection

solely because some of the information in it may be irrelevant for the purposes at hand. The foundational premise upon which such a purported suppression of speech could be warranted is that users who receive irrelevant information must be deemed incapable of dealing with it or of avoiding being adversely predisposed toward a consumer applicant because of it. The record before us does not permit such an assumption. Irrelevant information does not equate with false, or misleading, information. Neither can a "presumption" be supportable that the irrelevance of information makes it highly likely to be misleading, or even negative. Thus, the regulation in Section 1321 that requires a reporting agency to exclude from its reports information it has reason to believe is not "relevant" to the purpose for which it was sought infringes too sweepingly upon constitutionally protected commercial speech.

Finally, we comment specifically upon one aspect of the repealed version of Section 1321 that we have not yet discussed. Under the Maine Act as originally enacted Section 1321 prohibited consumer reporting agencies from making and selling reports containing expressly identified categories of prohibited information, and it also prohibited users from using reports containing such information:

> "Neither a consumer reporting agency nor a merchant shall collect, evaluate, prepare, use or report . . . information based on uncorroborated hearsay, or information about a consumer's . . . personal life style, philosophy . . . ." 10 M.R.S.A. § 1321(1) (Supp.1977–78) [19] (repealed).

Thus, the prohibition of speech by the consumer reporting agency was closely tailored to the prohibition against the use of certain criteria by merchants. Such type of regula-

---

**19.** The other categories of prohibited information in the original version of Section 1321– race, religion, ethnic origin, color, ancestry, and political affiliation–were carried forward into the amended version. The only distinction between the repealed and amended Section 1321 with respect to these other categories is that under the original Section 1321 such categories were expressly made unlawful criteria for *all* merchants, or users. Under the amended version, which does not prohibit "merchants" from using such information, those particular categories of information would be unlawful criteria only where so declared by an independent statute, e. g., the Maine Human Rights Act.

tion tends to go far beyond, if it touches at all, any of those "zones" of "privacy" that, as we discussed earlier, government may have a substantial interest in protecting. Information "about a consumer's personal life style" or "about a consumer's philosophy" relates to matters tending to be *publicly* known, as the definition of "investigative consumer report" confirms by referring to the sources of such information as being "neighbors, friends, . . . associates . . . or . . . others with whom [the consumer] is acquainted or who may have knowledge concerning any such items of information . . . ." In short, the regulation is not narrowly drawn to ferret out only those parts that directly bear upon such particular "areas" of "privacy" fairly deemed to make a claim for governmental protection that is substantial, as illustrated by the protections afforded constitutionally or by the law of torts.

We conclude, therefore, that the original version of Section 1321 is unconstitutional as an impermissible restriction upon commercial speech protected under the First–Fourteenth Amendments.

In summary, our decision is that the Superior Court Justice correctly adjudicated that the following provisions of the Maine Act transgress the protections afforded commercial speech by the First–Fourteenth Amendments: original, and amended, Sections 1314(1) and 1321(1); those particular provisions in original, and amended, Sections 1321(2) and (3) prohibiting the inclusion in a consumer agency report, or reten-

tion in its file, of information the reporting agency "has . . . reason to believe is not relevant to the purpose for which it is sought"; original and amended, Section 1321(4)(A). We order added to these the part of amended Section 1323(2) which allows for the imposition of additional damages for each "irrelevant" item that the consumer reporting agency supplies.

## II–D. The Challenge to Section 1313.

■ We proceed to plaintiff's attack, levelled by cross appeal, on the constitutionality of Section 1313 of the Maine Act.[20] The contention, as to which the Superior Court Justice made no decision, is that Section 1313 must be nullified as *facially* violative of the First–Fourteenth Amendment protections afforded commercial speech.

Section 1313 authorizes a consumer reporting agency to furnish a consumer report *only* in the particular circumstances therein provided. These limitations may give surface suggestion that Section 1313 unduly abridges constitutionally protected commercial speech. From closer examination of them, however, we conclude that the infirmity is more apparent than real. The reason for our conclusion is that regardless of any of the other restrictions imposed, Section 1313(3)(E) allows a consumer report to be furnished to any person whom the consumer reporting agency "has reason to believe . . . has a legitimate business need for the information in connection with a business transaction involving the con-

**20.** 10 M.R.S.A. § 1313 (Supp.1979–80) provides:

"A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

"*1. In response to the order.* In response to the order of a court having jurisdiction to issue such an order;

"*2. In accordance with the written instruction of the consumer.* In accordance with the written instructions of the consumer to whom it relates;

"*3. To certain persons.* To a person who it has reason to believe:

"*A.* Intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of

credit to, or review or collection of an account of, the consumer;

"*B.* Intends to use the information for employment purposes;

"*C.* Intends to use the information in connection with the underwriting of insurance involving the consumer;

"*D.* Intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

"*E.* Otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer."

sumer." In effect, then, this provision overrides all the other limitations and permits consumer reports to be furnished in a circumstantial context so essentially unlimited that it may fairly be regarded as leaving commercial speech practically unrestricted. Although circumstances lying outside Section 1313(3)(E), as well as outside the other authorizations in Section 1313(3), may be hypothesized in which the furnishing of consumer reports would be prohibited, thereby to make it arguable that restraints are imposed on constitutionally protected commercial speech, we refuse to nullify Section 1313 in *all* its *applications*, i. e., *facially*, merely because of such hypothetically conceived particular applications likely to be marginal in nature and rarely to occur. We therefore leave for that future case which will involve as reality what may presently be hypothesized by imagination, namely, the determination whether Section 1313 *as so applied* may transgress, without warrant, constitutionally protected commercial speech.[21]

### III. OTHER CONSTITUTIONAL CHALLENGES.

Regarding those provisions of Section 1314 and of Section 1321 that we have held unconstitutional as violative of protections given commercial speech by the First–Fourteenth Amendments, we find it unnecessary to decide other contentions that those same provisions contravene federal protections of substantive due process, the equal protection of the laws and interstate commerce. Hence, we confine our further review to the constitutional attacks on such other provisions of the Maine Act as we have not previously invalidated.

#### III–A. The Fourteenth Amendment "Vaqueness" Issues.

■ By their cross appeal plaintiffs have challenged the phrase in Section 1326 of the original Act, "person not authorized to receive that information" and the phrase in Section 1323(2) of the original Act, "$100 for each item of erroneous information reported which was the result of final action", as being too vague to accord with the "due process of law" mandate of the Fourteenth Amendment. On each of these issues the Superior Court Justice ruled against plaintiffs' contention.

Plaintiffs' claim of unconstitutional vagueness in the phrase "person not authorized . . . " fails because of the 1978 amendment to Section 1326. As pertinent, that section originally read:

"any officer or employee of a consumer reporting agency who knowingly and intentionally provides information concerning an individual from the agency's files *to a person not* authorized to receive that information shall be fined . . . or imprisoned . . .." 10 M.R.S.A. § 1326 (Supp.1977–78) (amended 1978) (emphasis added)

The 1978 amendment changed the language as follows:

"any officer or employee of a consumer reporting agency who knowingly and intentionally provides information concerning an individual from the agency's files *to a person not authorized, within the meaning of sections 1313 and 1314 subsection 1,* to receive that information shall be fined . . . or imprisoned . . .." 10 M.R.S.A. § 1326 (Supp.1979–80) (emphasis added)

The language given emphasis replaced the prior language challenged by plaintiffs as vague. The amending Act, P.L.1977 c. 677, was entitled "AN ACT to Clarify and Define Certain Existing Provisions of the Maine Fair Credit Reporting Act." The "Statement of Fact" accompanying Legislative Document No. 2192, from which the

---

**21.** This approach is in line with the reluctance of the Supreme Court of the United States to extend to the area of *commercial* speech the "chilling" doctrine applicable to other modes of constitutionally protected speech, which allows "a person . . . [to] challenge a statute on the ground that it might be applied unconstitu-

tionally in circumstances other than those before the court." *Bates v. State Bar of Arizona,* 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *see Central Hudson Gas & Electric Corp., supra,* —— U.S. n.8 at ——, 100 S.Ct. n.8 at 2351.

amending Act was drawn, stated that this change "clarifies" the meaning of "authorized" in Section 1326. We think it plain, then, that the amendment purported to express what the legislative intendment had been from the outset. This kind of clarification requires rejection of the vagueness challenge here made by plaintiffs which involves, we stress, no claim of rights deriving from reliance on the terms of the statute prior to the 1978 amendment.

We also turn aside plaintiffs' "vagueness" attack on the provision in the original version of Section 1323(2) authorizing an award of special damages as the Court may find appropriate, but in any event

> "not less than $100 for each item of erroneous information reported which was the *result of* final action." (emphasis added)

As to the alleged vagueness in the language emphasized, which appears to make erroneous information reported the "result of" rather than, as would make sense in the context, the factor which "results in" final action, the Superior Court Justice decided that the provision could have been written more artfully but nevertheless

> "a reasonable person would conclude that a reporting agency would be fined for each item of erroneous information *resulting in* final action by the user, that is, [which is] a determining factor of the user's decision."

We agree, and we add as a supporting consideration the subsequent amendment of Section 1323(2),[22] which, although of more extensive scope, includes a reiteration of legislative intendment that the agency be penalized for each separate infraction that may have *contributed* to a user's adverse decision.

### III–B.  The Supremacy Clause Challenges.

■ Plaintiffs contend that the regulatory scheme and purposes of the Federal

Act cannot be reconciled with divergent provisions of the Maine Act listed as follows.

1–The original Section 1317(4)(C), which required that upon the discovery of erroneous information in a report, a consumer reporting agency shall notify all those who received said report within a two year period preceding the discovery. The corresponding Federal Act provision requires such notification only at the request of the consumer. 15 U.S.C. § 1681i(d).

2–Section 1315(1)(A) in the original and amended Maine Act, which places limitations on the disclosure of medical information. The Federal Act specifically excludes medical information from disclosure limitations.

3–Section 1319(2) of the Maine Act, which mandates that all investigative consumer reports be written whereas the Federal Act allows reports to be oral. 15 U.S.C. § 1681a(d), (e).

4–The omission of the Maine Act to confer the qualified immunity that the Federal Act affords to consumer reporting agencies, users, or sources of information against liability in actions in the nature of defamation, invasion of privacy, and negligence in the reporting of information. 15 U.S.C. § 1681h(e).

5–The Maine Act fails expressly to authorize limited disclosure of information to a governmental agency whereas the Federal Act contains such an express authorization. 15 U.S.C. § 1681f.

Plaintiffs maintain that under the Supremacy clause of Article VI of the Constitution of the United States, the aforementioned Maine Act provisions must yield to those of the Federal Act.

The Federal Act expressly provides in Section 1681t that it

> rate or that the consumer reporting agency had reason to believe was not relevant to the purpose for which it was sought and that contributed in whole or in part to the decision to take adverse action against the consumer."

---

**22.** 10 M.R.S.A. § 1323(2) (Supp.1979–80) provides:

> "Such amount of additional damages as the court may allow, but not less than $100 for each violation of this chapter involving negligence, and for each consumer report containing any item of information that was inaccu-

"does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency."

Section 1681t thus manifests the Congressional intendment as to the scope of regulation left open to the states. The key inquiry relates to the meaning of "inconsistent."

The defendant Attorney General says that in view of the legislative history of Section 1681t, "inconsistent" should be held to mean "less protective of consumers." He argues on this basis that any state regulation affording consumers a *greater* protection than is given by the Federal Act cannot be "inconsistent" regulation, no matter what may be the impact upon consumer reporting agencies of such enhanced protection to consumers.

Congressional legislative history lends a degree of support to this contention. For example, Congresswoman Leonor Sullivan, who sponsored the House version of the Federal Act, HR16340, and chaired the Subcommittee on Consumer Affairs of the House Committee on Banking and Currency, suggested a concept of "inconsistency" as follows:

"State laws which are inconsistent with the Federal law would be pre–empted only to the extent of inconsistency. No state law, however, would be pre–empted unless compliance with that law would entail a violation of the Federal law. *In short, state laws requiring additional duties should not be affected by the passage of this law.*" 166 Cong.Rec. 36573 (1970) (emphasis added)

Despite this suggestion as to Congressional intendment, we must reject the Attorney General's contention. We regard as too simplistic the criterion he proposes. It would make one, albeit an important, objective of 1681t of the Federal Act–the protection of consumers–the absolutely controlling objective, denigrating all of the other objectives implicit not only in the express statement of findings in Section 1681(a) but also in other provisions of the Federal Act.

Indeed, the textual concept of "inconsistency" in Section 1681t tends to suggest that it embodies the decisional law on the general subject of federal preemption by virtue of the supremacy clause. The case law delineation of the "inconsistency" giving rise to federal preemption is that the state law frustrates, or stands as an obstacle to, the accomplishment of the *full* purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (emphasis added). *See Jones v. Rath Packing Company*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Furthermore, the entirety of the "inconsistency" phrasing in Section 1681t, "to the extent that those laws are inconsistent with *any* provision of this subchapter, *and then only to the extent of the inconsistency*" (emphasis added), discloses that Congress expected that state regulation would mesh closely with the Federal Act. Thus, the determination whether state law frustrates any particular provision of the Federal Act necessitates a comparison of specific requirements not only in terms of their particular content vis–a–vis each other but also in relation to the inquiry whether the "*full* purposes and objectives" of Congress are being thwarted. Since the sum total of purposes and objectives of the Federal Act cannot be reduced to the simple formula of "absolute protection for the consumer", we cannot say that a state retains unbridled authority to expand consumer protections while frustrating other objectives of the Federal Act. *See Retail Credit Co. v. Dade County, Florida*, 393 F.Supp. 577 (S.D.Fla. 1975).

### *III–B–1. Notification of Corrected Information.*

Plaintiffs contend that the requirement in the original Maine Act that upon discovering an error in a report, a consumer reporting agency shall notify all persons

who received that report within the previous two years, must fall in the face of the corresponding provision in the Federal Act, Section 1681c(d), which omits any such mandate for notification when there is no consumer request. Federal Section 1681c(d), however, does provide for an optional updating and correction of reports.

We are unpersuaded that the differences involved in a *mandate* of notification and an *option* of correction generates a conflict between the underlying purposes of the two Acts so serious as to render the difference in regulation constitutionally intolerable. *See Credit Data of Arizona, Inc. v. State of Arizona*, 602 F.2d 195 (9th Cir. 1979).

### III–B–2. The Requirement of Written Reports.

Plaintiffs contend that the Maine Act's mandate that investigative consumer reports be in writing cannot stand because the Federal Act permits such reports to be oral. Plaintiffs argue that the Federal Act reveals a federal concern that consumer reporting proceed rapidly and efficiently, and this federal interest tends to be impaired by an insistence on communication in writing.

The argument lacks cogency. The requirement of writing in Section 1319(2) of the Maine Act advances a purpose of both the Federal and Maine Acts, to assure the accuracy of reported information by the particular means of affording consumers access to the information. The stricter Maine requirement that the information be in writing results in a documentation and permanent recordation of the information communicated in a particular transaction. It thus makes it more accessible to consumers and reduces the likelihood that particular information may be omitted from reports communicated in the future. Balanced against these benefits, any delay

caused in the communication of information by the necessity of putting it in writing must be taken to be an incidental divergence of regulation insufficient to bring federal preemption into play. *See Credit Data of Arizona v. State of Arizona, supra.*

### III–B–3. Disclosure of "Medical Information."

Section 1315(1)(A)[23] of the Maine Act authorizes, with limitations, the disclosure to consumers of "medical information", defined in 10 M.R.S.A. § 1312(8) as

"information or records obtained, directly or indirectly and with the consent of the individual to whom it relates, from a licensed physician, medical practitioner, hospital, clinic or other medical or medically related facility."

The Federal Act defines "medical information" similarly but excludes it from mandated disclosure as follows:

"Every consumer reporting agency shall . . . disclose to the consumer:

"(1) The nature and substance of all information (except medical information) in its files on the consumer at the time of the request." 15 U.S.C. § 1681g(a)(1) (1974).

In *Retail Credit Co. v. Dade County, Florida, supra*, the preemption issue was raised by a challenge to the constitutionality of a provision in a Dade County Ordinance like that in Section 1315(1)(A). From examination of the Congressional legislative history the court learned that Congress had several times considered and rejected a provision basically similar to the one before it,[24] and it therefore concluded that Congress had plainly manifested intendment to refuse disclosure of medical information to consumers.

Despite the Federal Act's unqualified exclusion from disclosure of medical information, we think that the particular danger

---

**23.** Amended Section 1315(1)(A) is somewhat different in substance from its original version which authorized disclosure directly to the consumer "upon written authorization from the consumer's attending physician." Amended Section 1315(1)(A) permits disclosure to a li-

censed physician whom the consumer could then consult.

**24.** The various proposals rejected by Congress are summarized in *Retail Credit Co. v. Dade County, supra*, at 583, n. 10.

Congress sought to avoid thereby is sufficiently averted by the procedures set up in Section 1315(1)(A) to avoid nullification of them by federal preemption. The principal purpose of the federal unqualified exclusion, by definition applicable only to formal medical records, was revealed in the Committee Report to the House Amendment adding to Section 1681a(e) of the Federal Act the definition of the term "medical information." The Report said that

"[t]he rationale was that raw medical information should only be tendered with the counsel of a physician or other medically trained personnel." H.R.Report No. 91–975, 91st Cong., 2nd Sess., *reprinted in* [1970] U.S.Code. Cong. & Admin.News, p. 4394, at 4414.

Section 1315(1)(A) of the Maine Act is in harmony with this rationale, since it authorizes disclosure of medical information only to a licensed physician who may be expected to exercise professional judgment regarding further disclosure to the consumer. Thus, the Maine Act does not expose the consumer to "raw" medical information.

We are aware that Section 1315(1)(A) may not tend to serve a secondary purpose underlying the Federal Act's exclusion of medical information from disclosure: avoidance of an undermining of the traditional doctor–patient relationship that could arise because the physician to whom the information is disclosed might not be the same physician who had treated the consumer. 116 Cong. Rec. 17634 (October 9, 1970). *See Retail Credit Co. v. Dade County, Florida, supra,* at 582. We deem this too minor a divergence, however, to require applicability of preemption. We say this particularly since the physician who treated the patient will probably have kept medical records and will be able to advise the physician who receives the disclosed information; or else such records will likely be under the control of a medical facility where another physician may have access to them with the consumer's consent.

Accordingly, we sustain Section 1315(1)(A) of the Maine Act as not "inconsistent" with the purposes and objectives of the Federal Act.

### III–B–4. Qualified Immunity.

Section 1681h(e) of the Federal Act states:

"no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, except as to false information furnished with malice or willful intent to injure such consumer."

The three sections specifically referred to have the following scope. Section 1681g outlines the substantive content of the disclosure to be made to consumers; Section 1681h generally delineates the procedures by which the information is to be disclosed; and Section 1681m imposes disclosure requirements on users in particular circumstances.

The disclosure provisions of the Maine Act are generally patterned after those of the Federal Act, the objective of each Act being to have full disclosure to the consumer of all information required to be disclosed. However, the Maine Act goes beyond the Federal Act in the procedures established for disclosure. Whereas the Federal Act merely requires that consumer reporting agencies disclose the "nature and substance of all information",[25] 15 U.S.C. § 1681g(a)(1), the Maine Act goes further in prescribing means to ensure full disclosure, by requiring: (1) that a consumer reporting agency disclose "all information [except medical information which is subject to special disclosure rules] in its files on the consumer at the time of the request", 10 M.R.

---

**25.** Congress expressly rejected the notion that consumers should be allowed direct access to their files. *See* H.R. Report No. 91 -975, 91st Cong., 2nd Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, p. 4394, at 4415.

S.A. § 1315(1)(A); (2) that a consumer "be permitted a personal visual inspection of his file", 10 M.R.S.A. § 1316(2)(A); (3) that upon request, the consumer "shall be furnished copies of any investigative consumer reports," 10 M.R.S.A. § 1316(2)(A); and (4) that a consumer may receive "a copy of [his] file" through the mail, after a written request with proper identification. Section 1316(2)(C).

The other difference in this regard between the Maine and Federal Acts is that the Maine Act fails to confer the qualified immunity given by the Federal Act as to "any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information." The Maine legislature had considered amending the Maine Act to incorporate such a provision, but such an amendment was not enacted. *See* Legislative Record, 108th Legislature, 616–617 (March 16, 1978).

We decide that, consistently with the supremacy clause of the federal Constitution, the Maine Act's withholding of the qualified immunity conferred by the Federal Act may stand. We so conclude because the Maine Act resorts to an adequate alternative methodology of achieving the basic objective the Federal Act seeks to accomplish through the mechanism of qualified immunity, and thus it is in harmony with the Federal Act.

We therefore distinguish, at once, *Retail Credit Co. v. Dade County, supra*, on the ground that its holding rested on a virtual identity between the disclosure provisions of the Dade County Ordinance and those of the Federal Act, except that the Dade County Ordinance omitted the provision for qualified immunity. By contrast, although tending to follow the pattern of the Federal Act, the provisions of the Maine Act established *requirements* of disclosure to consumers not found in the Federal Act but which

serve the dominant purpose furthered by the Federal Act's grant of qualified immunity.

That purpose, which the Federal Act shares in common with the Maine Act, is to assure the full disclosure to consumers of all information about them that is being communicated through consumer agency reports, thereby to allow consumers not only to be aware of, but also to participate in the process of reviewing, refining, and correcting for accuracy the body of information that is so likely to underly important economic decisions affecting them.

The legislative history of the Federal Act reveals that Congress regarded qualified immunity as the "quid pro quo for full disclosure." 115 Cong.Rec. 13908 (November 6, 1969). To encourage agencies or users voluntarily to make the fullest possible disclosure to consumers of information on file, including all the adverse information, Congress concluded that they should be given a qualified immunity from liability in actions that may be brought against them for defamation, invasion of privacy or negligence in the reporting or use of information.

The Maine Act substitutes for this federal approach geared to stimulating *voluntary* disclosure an approach relying on *compulsion*. The Maine Act goes beyond the Federal Act's directive that the consumer be given a summary of the nature and substance of the information and requires that consumers shall have complete and direct access to the *files* and shall receive *copies* of the investigative consumer reports (although sources of information may be withheld, *see* Section 1315(1)(B). We conclude that this alternative technique utilized by the Maine Act to achieve fullness of disclosure to consumers sufficiently serves, without thwarting in any material respect, the foundational purpose of the Federal Act's grant of qualified immunity.[26] For this

---

26. The Congressional legislative history suggests that the Federal Act's conferring of qualified immunity on "any person who furnishes information to a consumer reporting agency" serves the ancillary purpose of avoiding drying

up of sources of information. The Maine Act's regulatory scheme does not tend to serve this purpose. However, when we concentrate on the kinds of suits likely to be brought against persons who are sources of information to con-

reason, then, the entirety of disclosure regulation by the Maine Act, an incidental aspect of which is the omission to confer qualified immunity, is not "inconsistent" with the Federal Act.

### III–B–5. Limited Disclosure to Governmental Agencies.

The Federal Act provides that

"a consumer reporting agency may furnish identifying information respecting any consumer, limited to his name, address, former addresses, places of employment, or former places of employment, to a governmental agency." 15 U.S.C. § 1681f (1974).

Plaintiffs contend that this provision for limited disclosure to governmental agencies must override by preemption what plaintiffs take to be a denial of it in the Maine Act—a denial shown, they say, by the omission of the Act to provide expressly for such limited disclosure combined with restrictions upon disclosure delineated in Section 1313.

Facially, the language of the Federal and Maine Acts does not present so direct a conflict, if conflict at all, as plaintiffs claim.

The Federal Act states only an authorization, not a mandate, for limited disclosure to governmental agencies, and the Maine Act does not plainly prohibit such limited disclosure. Despite the expressly stated restrictions of Section 1313, under Section (3)(D) or (E) thereof[27] disclosure to governmental agencies would be permissible in most cases likely to arise.

For the same policy reasons, then, that led us to decide against nullifying in this proceeding the restrictions imposed by Section 1313 as *facially* violating the constitutional protection of commercial speech, ante at pp. 208, 209, we decide against plaintiffs the issue of federal preemption relative to the disclosure of information to governmental agencies. We so decide because the issue is raised here on the basis of the *facial* provisions of the Maine and Federal Acts, rather than in an "as applied" context calling upon us to adjudicate in an actual set of circumstances whether the Maine Act prohibits a *particular* disclosure of information to a governmental agency which the Federal Act authorizes.

The entry shall be:

1–Appeal of defendant and cross appeal of plaintiffs denied.

---

sumer reporting agencies, we discern that of the three mentioned in the Federal Act only two, defamation and invasion of privacy suits, have relevance.

In a defamation action the source of information would not be subject to liability in any event unless the information given was false. That, in this regard, the Maine Act has thus chosen to give a higher priority to assuring a flow of information that is *true* rather than to assure the fullness of a flow of information *regardless* of truth or falsity does not cause it to be inconsistent with the basic purposes of the Federal Act. More particularly is this so since commercial speech that is *false* enjoys no constitutional protection and, hence, an objective to assist the flow of information that may be false is hardly an objective of importance.

As to suits for invasion of privacy, the conduct by which persons, as sources, provide information to consumer agencies will generally be such that they are likely to be exposed to liability in suits for invasion of privacy only as they are alleged to have participated in (1) publicizing the secrets, or certain intimate facts about the persons, of others, or (2) depicting persons to the public in a false light. Such conduct may reasonably be expected to occur rather infrequently in the consumer reporting

context. Hence, the need to protect it by conferring qualified immunity, in order to encourage a flow of information useful to consumer reporting agencies, is too marginal to yield a mandate, by preemption, that the Maine scheme of regulation embody the federal grant of qualified immunity.

27. These pertinent provisions of Section 1313 are:

"A consumer reporting agency may furnish a consumer report under the following circumstances and no other:

". . .

"3. . . . . To a person who it has reason to believe:

". . .

"D. Intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

"E. Otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer."

2–The judgment of the Superior Court is modified as follows:

(a) As to the first sentence thereof:

(1) by striking therefrom "ss 1321 and ss 1314" and inserting in their place: "Section 1314(1), Section 1321(1), those particular provisions in Section 1321(2) and (3) prohibiting the inclusion in a consumer agency report, or the retention in a consumer agency's file, of 'irrelevant' information or of information the agency 'has reason to believe is not relevant to the purpose for which it is sought', and Section 1321(4)(A)"; and

(2) by inserting after the words "amended version" and before the words "of the Maine Fair Credit Reporting Act" the phrase, to be set off by commas: "as well as Section 1323(2)."

Thus modified, said first sentence of the judgment is made to read in its entirety:

"The Court finds for the plaintiffs on the grounds that Section 1314(1), Section 1321(1), those particular provisions in Section 1321(2) and (3) prohibiting the inclusion in a consumer agency report, or the retention in a consumer agency's file, of 'irrelevant' information or of information the agency 'has reason to believe is not relevant to the purpose for which it is sought', and Section 1321(4)(A) of both the original and amended version, as well as Section 1323(2), of the Maine Fair Credit Reporting Act, 10 M.R.S.A. ss 1311 et seq. are void and unconstitutional for violation of the First Amendment."

(b) By striking from the judgment the sentence reading:

"Notwithstanding the Court's decision for the Plaintiffs on their First Amendment challenges, the Court also finds that the following terms are void for vagueness pursuant to the Due Process Clause of the Fourteenth Amendment: 'personal life style', 'philosophy' and 'uncorroborated hearsay' as found in ss 1321(1) of the original act; 'political beliefs' found in ss 1321(1) of the amended act; and in all instances where the term 'relevant', its negative or 'obsolete' are found in the original and amended versions of the act, including ss 1321(2) and (3) and ss 1323(2) of the amended act."

(c) By striking from the judgment the full sentence which commences with the words:

"The Court finds for the Defendants . . ."

and by substituting in place thereof a full sentence reading:

"The Court finds for the Defendant on Count 5 of Plaintiffs' Amended Complaint which alleged violations of the supremacy clause of Article VI of the Constitution of the United States."

3–The judgment of the Superior Court, as thus modified, is affirmed.

4–Case remanded to the Superior Court for entry of the modified judgment herein affirmed.

5–No costs on appeal.

All concurring.