338 So.2d 196 (1976)
John E. HARRIS, Appellant,
v.
BENEFICIAL FINANCE COMPANY OF JACKSONVILLE, a Florida Corporation, Appellee.
No. 48198.
Supreme Court of Florida.
July 30, 1976.
Rehearing Denied November 9, 1976.
*197 Alan A. Alop, Jacksonville, for appellant.
W. Douglas Childs and Bruce S. Bullock of Bullock, Sharp & Childs, Jacksonville, for appellee.
SUNDBERG, Justice.
In this appeal from an interlocutory order entered by the Circuit Court in and for Duval County, our jurisdiction derives from the fact that the trial judge passed upon the constitutionality of portions of Chapter 559, Florida Statutes. While this order does not constitute a final judgment, it can be reviewed in this Court through certiorari. Article V, Section 3(b)(3), Florida Constitution.
As appears from Appellant's pleadings in the trial court, on October 1, 1973, Beneficial Finance Company of Jacksonville, a Florida corporation, extended a consumer loan to John E. Harris. Harris made payments on this loan through June, 1974, when he found he could no longer make such payments. On or about September 3 and September 27, 1974, agents of the finance company, without his permission, contacted Harris' employer, Western Auto Company, in Jacksonville, Florida, regarding the overdue debt. On both of these occasions, Beneficial's agents communicated with Harris' employer in an effort to collect the outstanding obligation.
In January, 1975, Harris filed an action in the Circuit Court for Duval County, alleging that the defendant had violated the provisions of the Consumer Collection Practices Act (CCPA), Section 559.72(4), Florida Statutes:
"In collecting consumer claims, whether or not licensed by the division, no person shall:
"(4) Communicate or threaten to communicate with a debtor's employer prior to obtaining final judgment against the debtor, unless the debtor gives his permission in writing to contact his employer or acknowledges in writing the existence of the debt after the debt has been placed for collection, but this shall not prohibit a person from telling the debtor that his employer will be contacted if a final judgment is obtained."
The original complaint was dismissed upon motion of the defendant, Beneficial. Thereupon, plaintiff filed his amended complaint. *198 Ultimately Beneficial filed an amended motion to dismiss the amended complaint, challenging the validity of Section 559.72(4), Florida Statutes, as an unconstitutional infringement of the right of free speech guaranteed by the First Amendment. Also in its amended motion to dismiss, Beneficial contended that Section 559.77(1), Florida Statutes, the remedy provision of the CCPA which allows successful plaintiffs to recover either actual damages or $500, whichever is greater, constituted an unconstitutional deprivation of defendant's property without due process of law.
In an opinion and order dated September 24, 1975, the trial court rejected Beneficial's free speech attack on Section 559.72(4), Florida Statutes, but declared the minimum damage award provision of Section 559.77(1) to be unconstitutional on due process grounds. Plaintiff Harris appeals the latter decision, while defendant Beneficial has filed a cross-appeal on its unsuccessful free speech challenge to the statute.
After carefully considering Beneficial's constitutional challenge to Section 559.72(4), Florida Statutes, we have concluded that it must be rejected. The trial court properly applied the "commercial speech" doctrine to the facts of the instant case. See Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) (commercial handbill); Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (sexually-segregated want ads). Communication directed solely to the collection of a debt is purely commercial. While calling communication "commercial" does not serve to strip it of all constitutional guarantees, communications such as the one at issue here may more readily be curbed in the public interest than can speech which conveys political, social or religious thought. See generally Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).
Bigelow struck down a Virginia law under which a newspaper editor had been convicted for advertising the availability of legal medical abortions in New York. The Court rejected the Commonwealth's argument that the statute was constitutional because it could be applied only to commercial speech. The reason for this decision is instructive:
"The legitimacy of appellant's First Amendment claim in the present case is demonstrated by the important differences between the advertisement presently at issue and those involved in Chrestensen and Pittsburgh Press. ... Portions of its message, most prominently the lines, `Abortions are now legal in New York. There are no residency requirements,' involve the exercise of the freedom of communicating information and disseminating opinion." Bigelow at 2232.
Adding that "the advertisement conveyed information of potential interest and value to a diverse audience" and was newsworthy, the Court found that the speech involved "pertained to constitutional interests," and was protected under the First Amendment.
The United States Supreme Court recently revisited the "commercial speech" doctrine in Virginia St. Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (Opinion filed May 24, 1976). Consumers of prescription drugs sued the State Board of Pharmacy challenging the constitutionality of a Virginia statute declaring it to be unprofessional conduct for a licensed pharmacist to advertise the prices of prescription drugs. Reasoning that "speech which does `no more than propose a commercial transaction'" does not lack all First Amendment protection, the Court held the statute to be unconstitutional. In so doing, Mr. Justice Blackmun, writing for the majority, emphasized the value of the type of speech at issue  the price of prescription drugs  to the recipient of such information:
"As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. Appellees' case in this respect is a convincing one. Those whom the suppression of prescription drug price information hits *199 the hardest are the poor, the sick, and particularly the aged. A disproportionate amount of their income tends to be spent on prescription drugs; yet they are the least able to learn, by shopping from pharmacist to pharmacist, where their scarce dollars are best spent. When drug prices vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain or the enjoyment of basic necessities.
"Generalizing, society also may have a strong interest in the free flow of commercial information. Even an individual advertisement, though entirely `commercial,' may be of general public interest. The facts of decided cases furnish illustrations: advertisements stating that referral services for legal abortions are available, Bigelow v. Virginia, supra; that a manufacturer of artificial furs promotes his product as an alternative to the extinction by his competitors of fur-bearing mammals, see Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, 364 F. Supp. 16 (S.D.N.Y. 1973); and that a domestic producer advertises his product as an alternative to imports that tend to deprive American residents of their jobs, cf. Chicago Joint Board v. Chicago Tribune Co., 435 F.2d 470 (C.A. 7 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971). Obviously, not all commercial messages contain the same or even a very great public interest element. There are few to which such an element, however, could not be added. Our pharmacist, for example, could cast himself as a commentator on store-to-store disparities in drug prices, giving his own and those of a competitor as proof. We see little point in requiring him to do so, and little difference if he does not." Id. at 764, 96 S.Ct. at 1826.
(Emphasis supplied) (Footnote omitted)
The Court concluded that while "commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible." Justice Blackmun specifically mentioned the continuing validity of time, place and manner restrictions. Id. at 4692.
Careful perusal of Virginia State Board of Pharmacy convinces us that the instant statute is yet constitutional. As noted above, the Supreme Court found the dissemination of prescription drug prices, like other advertising information, to be "a matter of public interest." We doubt that Harris' credit problems can be so denominated. Furthermore, the potential recipients of the information sought to be conveyed in the Board of Pharmacy case had a striking and obvious interest in acquiring such knowledge. It is difficult for us to believe that Harris' employers have any similar interest in the information they received from Beneficial's agents.
In conclusion, we can discover in the collection procedures of appellee/cross-appellant finance company no significant public interest of the type found by the Bigelow and State Board of Pharmacy Courts. Thus the proper test in considering this statute is to weigh the individual's interest against the government's interest. Bigelow, supra, at 2234-35. We hold that the public interest in proscribing harassment of a debtor through contact with his employer about an obligation to a third party simply transcends a finance company's interest in choosing this particular means of collecting a debt. We note, furthermore, that the statute is restricted by its terms to those communications made "in collecting consumer claims," and so we reject Beneficial's argument that the Act is void for overbreadth.
Beneficial argued successfully before the trial court that the minimum damage provision of Section 559.77(1), Florida Statutes,[1] is unconstitutional as a denial of *200 due process of law. We disagree. The instant statute is sustainable as providing for liquidated damages in an area of the law in which ascertainment of the dollar amount of actual damages sustained in most instances will be extremely difficult, if not impossible, to achieve  a classic situation for application of liquidated damages. The United States Supreme Court has repeatedly upheld double damage awards against due process challenges. See, e.g., Lindsey v. Normet, 405 U.S. 56, 78, 92 S.Ct. 862, 877, 31 L.Ed.2d 36, 53 (1974); Missouri Pac. Ry. Co. v. Humes, 115 U.S. 512, 6 S.Ct. 1130, 29 L.Ed. 463 (1885). In Overnight Motor Trans. Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942), a double damage provision under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) was sustained against a due process challenge as providing "liquidated damages" of a compensatory nature. See also Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (either provable damages or $100, whichever is greater, for violations of Federal Truth-in-Lending Act, 15 U.S.C. § 1601 et seq.). A case upon which Beneficial relies, Missouri Pac. Ry. v. Tucker, 230 U.S. 340, 33 S.Ct. 961, 57 L.Ed. 1507 (1913), is clearly distinguishable because there the actual dollar damages sustained by the injured party were readily ascertainable, thus making the imposition by statute of liquidated damages in lieu thereof a denial of due process.
To Harris' assertion that the minimum award under the statute also may be sustained as a form of punitive damages, Beneficial responds that such a provision would be duplicative because the statute expressly provides for punitive damages in the court's discretion. We concur with Harris that the minimum award reasonably can be construed as providing a penalty designed to dissuade consumer collection agencies from engaging in the conduct proscribed, even where the legal standard of malice is not met. In enacting Section 559.72(4), supra, the Legislature prohibited a course of conduct which until then apparently was widely followed by consumer finance companies and collection agencies. The existence of this industrywide standard of practice would ordinarily be a defense against the imposition of punitive damages based on malicious intent. In the exercise of its police powers the Legislature chose this method of deterring wilful violations of the protective legislation it had enacted. The fact that the Act also authorizes a punitive damage recovery for the traditional case involving malice does not alter characterization of the $500 minimum award as punitive. Had the Legislature failed to include a traditional punitive damages measure, aggrieved consumers might well have been precluded from receiving any award of punitive damages where malice is evident. See Teamsters Local 20 v. Morton, 377 U.S. 252, 260-61, 84 S.Ct. 1253, 1258-59, 12 L.Ed.2d 280, 286-87 (1964). We believe that the Legislature intended to preserve common-law punitive remedies while expanding the type of damages available to injured parties under the Act so as to include the separate, statutory measure of damages at issue here.
In short, the minimum award afforded by the statute exhibits aspects of both liquidated and punitive damages. It clearly appears to have been the intent of the Legislature to provide a remedy for a class of injury where damages are difficult to prove and at the same time provide a penalty to dissuade parties such as Beneficial from engaging in collection practices which may have been heretofore tolerated industrywide. Neither objective is without the purview of proper legislative action. The Consumer Collection Practices Act is a laudable legislative attempt to curb what *201 the Legislature evidently found to be a series of abuses in the area of debtor-creditor relations. The legislation provided neither criminal penalties nor administrative enforcement. The minimum damage award and the civil suits it encourages constitute the only means by which the legislative purpose may be vindicated. We decline to strip the CCPA of the only self-enforcing mechanism it possesses.
The judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded for further proceedings not inconsistent herewith.
OVERTON, C.J., and ROBERTS, ADKINS, BOYD, ENGLAND and HATCHETT, JJ., concur.
NOTES
[1] debtor may bring a civil action against a person violating the provisions of this part in the circuit court of the county in which the alleged violator resides or has his principal place of business or in the county wherein the alleged violation occurred. Upon adverse adjudication, the defendant shall be liable for actual damages or five hundred dollars, whichever is greater, together with court costs and reasonable attorney's fees incurred by the plaintiff. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper, including enjoining the defendant from further violations of this part. If it appears to the court that the suit brought by the plaintiff was ill-founded or brought for purposes of harassment, the plaintiff shall be liable for court costs and reasonable attorney's fees incurred by the defendant."