STATE of Minnesota, by Warren
SPANNAUS, its Attorney
General, Respondent,

v.

CENTURY CAMERA, INC., et
al., Appellants,

Propper Oil and Auto Supply Warehouse
Distributing Co., Inc., d.b.a. 10000 Auto
Parts, et al., Defendants.

No. 51636.

Supreme Court of Minnesota.

Aug. 28, 1981.

Maslon, Edelman, Borman, Brand & McNulty, William Z. Pentelovich, Barbara R. Hauser and Mary P. Foarde, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., and Erica Jacobson, Sp. Asst. Atty. Gen., St. Paul, for State.

## OPINION

SHERAN, Chief Justice.

### I.

This case presents the question whether defendants'[1] constitutional rights of free speech and due process of law, guaranteed by both federal and state constitutions, are infringed by Minn.Stat. §§ 181.75–.76 (1980). Section 181.75 prohibits employers and their agents from "directly or indirectly solicit[ing] or requir[ing]" their employees or prospective employees to take a "polygraph, voice stress analysis, or any test purporting to test [their] honesty."[2-3] It

---

[1] All but two of the named defendants, Century Camera and Foresight Security Services of Minnesota, were dismissed early in the district court proceedings.

[2] Minn.Stat. § 181.75, subd. 1 (1980), reads:
No employer or agent thereof shall directly or indirectly solicit or require a polygraph, voice stress analysis, or any test purporting to test the honesty of any employee or prospective employee. No person shall sell to or interpret for an employer or his agent a test that he knows has been solicited or required by an employer or his agent to test the honesty of an employee or prospective employee. An employer or agent or any person knowingly selling, administering, or interpreting tests in violation of this section is guilty of a misdemeanor. If an employee requests a polygraph test any employer or agent administering the test shall inform him that taking the test is voluntary.

[3] A polygraph consists of a "combination of diagnostic instruments designed to detect and record graphically physiological respons-

also prohibits persons who sell, administer, or interpret such tests from doing so when they know the test has been solicited or required by an employer or his or her agent.[4] The disclosure of the fact that an individual has taken a "polygraph or any test purporting to test honesty" or the results of the test, without authorization of the individual, is prohibited by section 181.-76.[5] Defendants are an employer that has utilized polygraph tests and a partnership of two businesses that have administered them.

Specifically, we are called upon to answer three questions certified by the trial court as important or doubtful under Minn.R.Civ. App.P. 103.03(i) after the court's denial of defendants' motion for summary judgment on the ground of the unconstitutionality of the two statutes sought to be applied against them. The questions we consider are:

1. Are sections 181.75 and 181.76 unconstitutionally overbroad, in violation of the first amendment, as incorporated by the fourteenth amendment, and Minn.Const. art. 1, § 3?[6]

2. Are sections 181.75 and 181.76 unconstitutionally vague, in violation of the first amendment as incorporated by the fourteenth amendment, and Minn.Const. art. 1, § 3?[7]

3. Do sections 181.75 and 181.76 constitute a deprivation of property without due process of law, in violation of the fifth amendment, as incorporated by the fourteenth amendment, and Minn.Const. art. 1, § 7?

II.

Suit was brought by the State of Minnesota against defendants Century Camera, Inc., and Foresight Security Services of Minnesota for declaratory relief, injunctive relief, and civil penalties under Minn.Stat. § 181.75, subd. 3 (1980).[8] Foresight Security conducts background investigations, undercover investigations, and polygraph examinations of employees or potential employees for employers. Century Camera is a retail seller of photographic equipment and supplies that has utilized Foresight's services, including polygraph testing. It is also the sole shareholder of the stock of one of the companies in the Foresight partnership. In its complaint, the plaintiff State of Minnesota alleges that employees of Century Camera and applicants for employment have been asked to undergo either background interviews or polygraph examinations in a manner constituting a violation of section 181.75. The state also alleges that Foresight Security acts as an agent for Century Camera, soliciting or requiring the examinations, and disclosing the results in violation of sections 181.75 and 181.76. The factual questions of whether violations of

es to psychological stimuli (which are generally questions asked by the examiner). * * * [T]he polygraph records simultaneously * * several tracings, especially of the pulse, respiration, blood pressure, skin conductivity (with regard to electric current), etc." 2 Schmidt, Attorney's Dictionary of Medicine and Word Finder P–176 (1981). The polygraphic examination is "a form of interview or test employing a machine known as a polygraph, which provides certain data that the examiner uses in reaching his diagnosis of Truthful or Deceptive." D. Lykken, A Tremor in the Blood 9 (1981). Voice stress analysis, operating on tape recordings of a person's speech, is said to measure variations in emotional stress, from which deceptiveness or veracity may be inferred. *Id.* at 35.

4. *See* note 2 *supra.*

5. Minn.Stat. § 181.76 (1980) reads:

No person shall disclose that another person has taken a polygraph or any test purporting to test honesty or the results of that test except to the individual tested. If such a test is given after August 1, 1973 and at the employee's request, the results may be given only to persons authorized by the employee to receive the results. A person who violates this section is guilty of a misdemeanor.

6. The protection of freedom of speech guaranteed by Minn.Const. art. 1, § 3 is no more extensive in this case than the protection provided by the first amendment to the United States Constitution.

7. *See* note 6 *supra.*

8. No criminal penalties are at issue in this case, although violation of either section 181.75 or 181.76 constitutes a misdemeanor.

these sections occurred have not yet been tried. Defendants moved for summary judgment in their favor on the ground of unconstitutionality of the two statutes, and this appeal followed.

The district court found no violations of constitutional rights. That court considered the speech in issue under sections 181.75 and 181.76 to be commercial speech and therefore subject "to certain modes of regulation which might be impermissible in the realm of non-commercial expression." The trial court found the state's perception of the harm which employees may suffer "well founded," and the goal of preventing this harm "important and legitimate." The statutes survived overbreadth challenge because a "broad prophylactic" measure was necessary. Defendants' second and third claims were also rejected by the trial court.

### III.

*Are sections 181.75 and 181.76 unconstitutionally overbroad?*

In analyzing this question, the trial court concluded that the speech affected by sections 181.75 and 181.76 was commercial speech, thereby invoking the type of judicial review accorded regulations of commercial speech rather than that accorded regulations of noncommercial expression. With that conclusion we agree.

■ Commercial speech is protected by the first amendment. *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). But "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of

that activity." *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). Commercial speech is given "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, * * allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Id.*

Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). It includes speech which does "no more than propose a commercial transaction," such as price advertising. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Commission,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973)). We find no abstract definition of commercial speech, but there is a " 'common-sense' distinction between speech proposing a commercial transaction * * * and other varieties of speech." *Ohralik v. Ohio State Bar Assn.,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

Defendants, who disagree that the speech in issue is commercial speech, have suggested that the doctrine of commercial speech is intended to be limited to the context of advertising related to goods and services and should not be extended to the case before us involving communication in the context of employment. Defendants suggest that we should proceed cautiously in striking forth into the uncharted area of commercial speech.

Although the few cases in this area reaching the Supreme Court have discussed questions of service and price advertising,[9]

---

9. *See, e. g., Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (promotional advertising by an electric utility); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (use of trade names); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (advertising of drug price information). *See generally* Far-

other courts have expanded the doctrine beyond that limited context. In *Harris v. Beneficial Finance Co.*, 338 So.2d 196 (Fla. 1976), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1591, 51 L.Ed.2d 800 (1977), the commercial speech doctrine was applied to the communication between agents of a finance company and a debtor's employer. *See Equifax Services, Inc. v. Cohen*, 420 A.2d 189 (Me. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (commercial speech assumed arguendo to include credit information collected under the Maine Fair Credit Reporting Act); *Motor & Equipment Manufacturers Association v. Environmental Protection Agency*, 627 F.2d 1095 (D.C. Cir.1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980) (communication of maintenance information by manufacturer to consumer found to be commercial speech); *K.D. v. Educational Testing Service*, 87 Misc.2d 657, 386 N.Y.S.2d 747 (1976) (publication of test results held to be commercial speech).

■ In our view, there is no question but that the speech affected by sections 181.75 and 181.76 is commercial speech. An employer is not deprived of his or her first amendment right to communicate views, arguments, or opinions to employees by sections 181.75 and 181.76. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969). The employer who solicits or requires an employee to have a lie detector examination "does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). An employer engaging in the verbal activity of soliciting or requiring these examinations does not have any purpose other than the advancement of his or her business interests.

■ The defendants have claimed that sections 181.75 and 181.76 are overbroad. A statute is overbroad if within its reach it prohibits constitutionally protected activity, as well as activity which may be prohibited without offending constitutional rights. *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). The defendants' standing to challenge these statutes as facially overbroad does not depend upon whether their own activity is or is not privileged itself. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980); *Bates v. State Bar of Arizona*, 433 U.S. 350, 379–80, 97 S.Ct. 2691, 2706–07, 53 L.Ed.2d 810 (1977); *State v. Hipp*, 298 Minn. 81, 86–87, 213 N.W.2d 610, 614 (1973). We allow persons to challenge a statute, even if their own speech may be validly prohibited, because of the possibility that protected speech may be chilled by the overly broad reach of a statute. *See, e. g., Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). *See generally* Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 853–54 (1970).

■ The Supreme Court has stated that the overbreadth doctrine is inapplicable in "certain commercial speech cases," *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980), such as *Bates v. State Bar of Arizona*, in which it was held that a disciplinary regulation could not be applied to prohibit truthful attorney advertising in a newspaper. This is so because commercial speech is a "hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation,'" *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564 n.6, 100 S.Ct. 2343, 2350 n.6, 65 L.Ed.2d 341 (1980) (quoting *Bates v. State Bar of Arizona*, 443 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977)). Unlike price

ber, *Commercial Speech and First Amendment Theory*, 74 Nw. U.L.Rev. 372, 381 (1979); Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va. L.Rev. 1, 1–2 (1979).

advertising for goods or services, which clearly involves commercial speech alone, sections 181.75 and 181.76 potentially inhibit noncommercial speech. For example, an employer's letter to the editor of the local newspaper on the subject of polygraph testing would not necessarily be commercial speech and it might, in a rare case, constitute "solicit[ing] or requir[ing]" in violation of section 181.75. Because of this potential danger, we do not feel that this is one of the "certain commercial speech cases" in which the overbreadth doctrine is inappropriate.

Defendants' claim is that "regulation of employer speech is permissible only if it proscribes some element of coercion." Failing to limit its prohibition to "coercion," section 181.75 would then be overbroad. Defendants base their claim on their interpretation of *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which we find to be incorrect.

In *Gissel Packing* an employer had been found to have committed unfair labor practices under federal labor laws. The Court rejected the employer's first amendment claim, holding that one subdivision of the labor laws

> merely implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice," so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of § 8(a)(1). Section 8(a)(1), in turn, prohibits interference, restraint or *coercion* of employees in the exercise of their right to self-organization.

*Id.* at 617, 89 S.Ct. at 1941 (emphasis added). We cannot agree with defendants that the quoted passage is intended to mean that the only regulations of any kind of employer speech which will pass constitutional muster are those prohibiting "coercive" speech.

Defendants' argument was no doubt bottomed on the fact that section 181.75 at one time specifically prohibited "coercion," but

was amended in 1976 to omit that word. *See* Act of Apr. 13, 1976, ch. 256, 1976 Minn.Laws 950. The first version of the statute, enacted in 1973, stated that "[n]o employer or agent thereof shall by direct or indirect *coercion* request or require a polygraph or any test purporting to test the honesty of any employee or prospective employee." Act of May 24, 1973, ch. 667, § 1, 1973 Minn.Laws 1760 (emphasis added).

We stress that the word "coercion" is no talisman of constitutionality for a statute prohibiting commercial speech. But we note that an element of coercion is nevertheless implicit in the statute as it now reads because of the unequal position of an employee vis-a-vis an employer. The employer wields power because he or she controls the employee's job. When an employee is asked by an employer to submit to a polygraph or similar examination, he or she often has no realistic alternative but to agree. *State v. Community Distributors, Inc.,* 64 N.J. 479, 484, 317 A.2d 697, 699 (1974).

■ We find that section 181.75 is not overbroad due to the absence of the word "coercion" from the statute. Unless sections 181.75 and 181.76 are otherwise impermissible regulations of commercial speech, our discussion would end here.

■ Defendants claim that section 181.75 "prohibits speech on a certain subject and seeks to suppress entirely the expression of certain ideas." Section 181.76, which prohibits disclosing that an individual has taken a polygraph or similar examination or the results of it, is said to be an "all-inclusive gag order" and "outright censorship," akin to the prior restraint outlawed 50 years ago in *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Laws which prohibit persons from speaking certain words or conveying certain ideas are not often tolerated by the first amendment. Regulations of noncommercial expression may be upheld only when the law is a "narrowly tailored means of serving a compelling state interest," *Consolidated Edison*

*Co. v. Public Service Commission*, 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980), and seldom will a state's interest be so compelling as to justify a blanket prohibition of the utterance of certain words or information. But, because of the differences between commercial expression and noncommercial expression, regulations of commercial speech such as the ones at issue here may be tolerated even if, literally, they prohibit an employer from speaking words which convey to an employee that he or she is required to take a polygraph or similar test or is being solicited to do so.

█ Regulations of commercial speech will be upheld not if the state's interest is "compelling" and the means "narrowly tailored," but rather if the regulations withstand a four-part analysis summarized in the *Central Hudson Gas* case:

> For commercial speech to come within [the protection of the first amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341.[10]

Plaintiff State of Minnesota argues that the speech at issue here is misleading and therefore falls outside of first amendment protection under the first part of the above analysis. In *Central Hudson Gas*, as an example of unprotected communications which are "more likely to deceive the public than to inform it," *id.* at 563, 100 S.Ct. at 2349, the Supreme Court cited *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Plaintiff asserts this case is similar to *Ohralik*.

The court in *Ohralik* upheld a state disciplinary rule prohibiting lawyers from soliciting clients in person. To offer his legal services, Ohralik had approached an 18-year-old victim of an automobile accident in her hospital room and the 18-year-old passenger at her home, "at a time when they were especially incapable of making informed judgments or of assessing and protecting their own interests." *Id.* at 467, 98 S.Ct. at 1924. This conduct illustrated the "potential for overreaching that is inherent in a lawyer's in-person solicitation of professional employment" and the need for the disciplinary rule prohibiting such conduct. *Id.* at 468, 98 S.Ct. at 1924.

Plaintiff claims a "potential for overreaching" in the situation before us because of the unequal positions of employer and employee. The State reasons that the employer speech must be likely to deceive, as was the speech in *Ohralik*. But that is not the case. In *Ohralik*, the overreaching of the lawyer could cause the victim to be misled into hiring a lawyer without having the opportunity to gather more information and to make her decision in an unpressured situation. Here compulsion is present, but there is no lack of information, or of complete information, affecting in some way the employee's decision-making process. Indeed, the information conveyed by an employer when he or she requires or solicits a polygraph or similar examination is all too clear. The employees are not misled; they are simply coerced.

We next consider whether the state interest justifying sections 181.75 and 181.76 is substantial. The defendants have not suggested that the state could not or did not show that sections 181.75 and 181.76 further substantial state interests.[11]

As we view the record in this case,[12] the plaintiff State of Minnesota has not failed

---

**10.** The final inquiry of this analysis is not an application of the overbreadth doctrine. *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 565 n.8, 100 S.Ct. 2343, 2351 n.8, 65 L.Ed.2d 341 (1980).

**11.** However, defendants assert that even if a substantial interest were shown the statutes fail to satisfy the final portion of the *Central Hudson Gas* case, discussed below.

**12.** Our analysis of whether these statutes meet the requirements of *Central Hudson Gas* is lim-

to show a substantial state interest. The state's interests here are several: encouraging the maintenance of a harmonious atmosphere in employment relationships which may be disturbed by the coercion to take a polygraph or similar examination; protecting an employee's expectation of privacy which he or she may have if the questions put during these examinations are personal, private, or confidential; discouraging practices which demean or appear to demean the dignity of an individual employee in a significant way; protecting employees from adverse inferences drawn if they refuse to take these tests; and avoiding the coercive impact present in the solicitation.

No one can doubt the importance of regulating the employment relationship to discourage unfair or potentially unfair practices. *See, e. g.*, Minn.Stat. chs. 181, 181A, 181B, 182, 185 (1980). In our courts we have questioned the validity of polygraph examinations and refused to allow the results of such tests to be admitted as competent evidence. *See C.M.C. v. A.P.F.*, 257 N.W.2d 282 (Minn.1977), *appeal dismissed*, 434 U.S. 1029, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978); *State v. Goblirsch*, 309 Minn. 401, 407, 246 N.W.2d 12, 15 (1976).[13] We note that the State of Minnesota is not alone in prohibiting employers from compelling employees to take polygraph or similar tests.[14]

ited to the facts as they now appear in the record. We leave open the possibility that the parties may wish to submit facts relating to the conclusions we reach here in the application of *Central Hudson Gas*. Should they choose to do so, the application of *Central Hudson Gas* may be reconsidered by the trial court.

13. We have no facts before us in this record about the validity of polygraph examinations or similar tests measuring physiological changes, other than facts which we judicially notice in books and articles on the subject. This material indicates that there is very little evidence of the accuracy and predictive value of so-called lie detector tests and this evidence is, at best, inconclusive. D. Lykken, *supra* note 3, 81, 100–01, 122–26, 159–60; Note, *The Polygraph and Pre-employment Screening*, 13 Houston L.Rev. 551, 553–55 (1976). *See generally* Hermann, *Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing*, 47 Wash.L. Rev. 73, 85–86 (1971).

14. At least 15 other states and the District of Columbia have laws similar to sections 181.-75 and 181.76. *See* Alaska Stat. § 23.10.037 (1972) (prohibits employer requesting, suggesting, or requiring polygraph or lie detector test as a condition of employment or continued employment; police employment exempted); Cal. Lab. Code § 432.2 (West 1971) (prohibits employer demanding or requiring polygraph, lie detector, or similar test as a condition of employment or continued employment; government employment exempted); Conn.Gen.Stat. § 31–51g (1981) (prohibits requesting or requiring polygraph examination as a condition of employment or continued employment; police employment exempted); Del.Code Ann. tit. 19, § 704 (1979) (prohibits requiring, requesting, suggesting, or indirectly or directly causing an employee to take a polygraph, lie detector, or similar test as a condition of employment or

continued employment; use by police in official duties exempted); D.C.Code Ann. § 36–902 (Supp.1980) (no employer shall administer, accept or use the results of any lie detector test in connection with employment or applications; use by police in criminal and internal investigation exempted); Haw.Rev.Stat. § 378–21 (1976) (prohibits requiring a polygraph or lie detector test as a condition of employment or continued employment); Idaho Code §§ 44–903, –904 (1977) (prohibiting requiring polygraph or any lie detector test as a condition of employment or continued employment; law enforcement and government employment exempted); Md. Ann. Code art. 100, § 95 (1979) (prohibits demanding or requiring polygraph, lie detector, or similar test as a condition of employment or continued employment; federal government and law enforcement employment exempted); Mass.Ann.Laws ch. 149, § 19B (Michie/Law. Co-op 1976) (prohibits subjecting employees or applicants to lie detector test or directly or indirectly requesting them to take it; use by law enforcement agencies in criminal investigations exempted); Mich.Comp.Laws Ann. § 338.1726 (1976) (prohibits employer requiring polygraph, lie detector, or similar test); Mont. Rev. Codes Ann. § 39–2–304 (1979) (prohibits requiring polygraph or any form of mechanical lie detector test as a condition of employment or continued employment; exempts law enforcement employment); N.J.Stat.Ann. § 2A:170–90.1 (West 1971) (prohibits influencing, requesting, or requiring an employee to take a lie detector test as a condition of employment or continued employment); Or.Rev. Stat. §§ 659.225, .227 (1979) (prohibits requiring polygraph or lie detector test as a condition of employment or continued employment; proscribes subjecting employee or applicant to test, directly or indirectly, as an unfair labor practice; use by law enforcement agencies in criminal investigation exempted); 18 Pa.Cons. Stat.Ann. § 7321 (Purdon 1973) (prohibits re-

Next we focus on the relationship between the state's interest and the regulation of commercial speech imposed by sections 181.75 and 181.76. We find this relationship to be constitutionally adequate because there is a direct link between prohibiting solicitation or requirement of polygraph and similar tests and achieving the ends sought by the legislature. These ends are the elimination of the adverse effects of such action by the employer on the individual employee or the employment relationship. What is proscribed by the statute precisely captures the harms envisioned by the legislature. *See Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 464, 98 S.Ct. 1912, 1922, 56 L.Ed.2d 444 (1978).

Finally, we consider whether sections 181.75 and 181.76 are not more extensive than necessary to serve the interest of the state. Defendants suggested, in another context, that the state might choose to license polygraph examiners. Several states have undertaken licensing of polygraph examiners.[15] But it is apparent that licensing the examiner does not at all meet the problems of the coercion of employees by employers nor the assaults upon the dignity of the employee. *See* Hermann, *supra* note 13, at 101–02. Nor does licensing affect the problem of disclosure of test results.

Had the legislature chosen to prohibit the *use* of polygraph or similar examinations in the employment context, that too would not have affected the plight of an employee who is solicited to take the test but refuses to do so and whose employment status suffers as a consequence. Such a prohibition

of the use of the polygraph or similar examinations in the employment context would itself be more extensive than necessary because it would prohibit the purely voluntary offer of polygraph results by an employee. Moreover, prohibition of the use would not protect a person who has taken an examination from the disclosure of the results. Sections 181.75 and 181.76 do not appear to be more extensive than necessary.

Having applied the four-part analysis of *Central Hudson Gas*, we conclude that sections 181.75 and 181.76 impose no unconstitutional limitation on commercial speech. The two sections are not overbroad and defendants' first certified question must be answered in the negative.

## IV.

*Are sections 181.75 and 181.76 unconstitutionally vague?*

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). In order to provide fair warning, "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," so that he or she may act accordingly. *Id.* Defendants assert that section 181.75 is vague because it prohibits soliciting "indirectly." They claim "[t]he chilling effect of 'indirectly' could reasonably deter all speech concerning polygraphs." Both sections 181.-75 and 181.76 contain the phrase "any test purporting to test honesty," making the

---

quiring polygraph or mechanical or electrical lie detector test as a condition of employment or continued employment; exempts law enforcement employment and employees dispensing drugs); R.I.Gen.Laws §§ 28–6.1–1, .1–2 (1979) (prohibits requiring or subjecting to lie detector as a condition of employment or continued employment; makes punishable by fine subjecting or directly or indirectly causing test to be taken, exempts law enforcement agencies in performance of their official duties); Wash. Rev. Code Ann. § 49.44.120 (West 1981) (prohibits requiring a lie detector or similar test as a condition of employment or continued em-

ployment; exempts use for law enforcement employment, for employees dispensing controlled substances, or for those involved with national security matters). *See also State v. Community Distributors, Inc.*, 64 N.J. 479, 317 A.2d 697 (1974); *State v. Vornado, Inc.*, 155 N.J.Super. 354, 382 A.2d 945 (1978); *State v. Berkey Photo, Inc.*, 150 N.J.Super. 56, 374 A.2d 1226 (1977).

**15.** *See, e. g.* Mich.Comp.Laws Ann. § 338.1708 (1978); Va.Code § 54–918 (1978). *See also* Note, *Lie Detectors in the Employment Context*, 35 La.L.Rev. 694, 702 n.48 (1975).

statutes unconstitutionally vague, defendants claim, because it may "chill employers from asking perfectly legitimate questions about an employee's honesty."

█ We do not agree that "indirect" solicitation is so vague that persons "of common intelligence must necessarily guess at its meaning." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). It should be apparent that "indirect" means "not direct;" and neither of the adverbs "directly" or "indirectly" alters the meaning of the words "solicit" or "require" or lessens in any way the requirement that the employer be found to have *solicited* or *required* the employee or applicant to take a polygraph, voice stress analysis, or similar test. The phrase "directly or indirectly" in section 181.75 actually serves to warn employers that the prohibition extends to solicitation which may be subtle. "A statute will not be declared void for vagueness and uncertainty where the meaning thereof may be implied, or where it employs words in common use, or words commonly understood * * * or [having] an unmistakable significance in the connection in which they are employed." *Invention Marketing Inc. v. Spannaus*, 279 N.W.2d 74, 80 (Minn.1979) (quoting *Wichelman v. Missner*, 250 Minn. 88, 111, 83 N.W.2d 800, 819 (1957)). Section 181.75 will not be declared unconstitutionally vague merely because situations can be imagined in which it will be difficult to prove that what occurred was solicitation.

█ On the other hand, we feel that the phrase "any test purporting to test honesty" would render both sections 181.75 and 181.76 unconstitutionally vague in the absence of an authoritive construction. The two techniques enumerated in section 181.-75, the polygraph and the voice stress analysis, both purport to measure physiological changes.[16] Accordingly, we construe "any test purporting to test honesty" to be limited to those tests and procedures which similarly purport to measure physiological changes in the subject tested. Thus, we

exclude from the current prohibitions of section 181.75 written psychological questionnaires, personal judgments made by an employer or his or her agent, even if based in part on observations of physical behavior or demeanor, and all other gauges of honesty which do not purport to measure physiological changes. With this construction, neither section 181.75 nor section 181.76 is unconstitutionally vague.

## V.

*Do sections 181.75 and 181.76 result in an unconstitutional deprivation of property without due process of law?*

█ Defendants claim they suffer a deprivation of property without due process because, without outlawing the profession entirely, sections 181.75 and 181.76 severely reduce the quantity of polygraph, or similar testing they will have the opportunity to conduct. Defendants properly point out that "[a] right to conduct a business * * * is property within the due process clause of the constitution." *Connor v. Township of Chanhassen*, 249 Minn. 205, 216, 81 N.W.2d 789, 797 (1957). But the legislature is empowered to enact legislation for the purpose of public health or general welfare which is legitimately or reasonably related to that purpose. *City of St. Paul v. Dalsin*, 245 Minn. 325, 329, 71 N.W.2d 855, 858 (1955). It has been said that "even a legitimate occupation may be restricted or prohibited in the public interest." *Breard v. Alexandria*, 341 U.S. 622, 632–33, 71 S.Ct. 920, 927, 95 L.Ed. 1233 (1951).

█ We have already determined above that the state's interest in the regulation of commercial speech imposed by sections 181.-75 and 181.76 is substantial and that the statutes are suitably tailored to achieve this interest. The statutes clearly satisfy the requirement that the regulation be "reasonably related" to a state's purpose. The fact that a person may not be able to expand his or her business as greatly as he or she might prefer does not undercut the reasonableness of the regulation. Defendants'

16. *See note 3 supra.*

third and final certified question must therefore be answered in the negative: no unconstitutional deprivation of property is wrought by sections 181.75 and 181.76.

## VI.

The regulations of commercial speech at issue here, sections 181.75 and 181.76, do not infringe the defendants' first amendment freedoms on account of overbreadth or vagueness, nor is there a deprivation of property without due process.

We remand this case to the trial court for further proceedings consistent with this opinion.