Wanda G. KAMRATH, Respondent,

v.

SUBURBAN NATIONAL BANK, Appellant.

No. C8–84–1308.

Court of Appeals of Minnesota.

Feb. 19, 1985.

James H. Kaster, Nichols, Kruger, Starks & Carruthers, Minneapolis, for respondent.

James T. Martin, Minneapolis, for appellant.

Heard, considered, and decided by WOZNIAK, P.J., and PARKER and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

This is an appeal from a jury verdict determining that appellant Suburban National Bank (Suburban), through its agent Al Lyng, asked its employee, respondent Wanda Lind Kamrath (Kamrath), to take a polygraph test in violation of Minn.Stat.

§ 181.75 (1984). The jury found Kamrath was entitled to $60,000 in damages. The court determined Suburban should pay $30,000 in attorney's fees, and denied its motion for judgment notwithstanding the verdict, new trial, or remittitur. We affirm.

## FACTS

Kamrath was employed by Suburban as a teller. In December 1976, several deposits from the local McDonald's restaurant were missing. The Eden Prairie police department, in cooperation with McDonald's corporation, decided to request a polygraph test of several McDonald's employees. Two bank tellers were also tested, although the tellers were not considered suspects. Kamrath was one of those tellers. She testified that Al Lyng, a bank vice-president, asked her to take the test, informing her she could refuse. Lyng does not remember asking her, and testified that he did not know about the tests until after they occurred. Sergeant Les Bridger of the Eden Prairie police department, who conducted the criminal investigation, testified that he must have made the request, although he does not remember doing so.

Several days after Kamrath took the test, she began to have nightmares about the examination. In the nightmares, which lasted for approximately sixteen months, the polygraph test chair turned into an electric chair, and ended with Kamrath's wetting the bed. Her family testified she became more withdrawn, gained weight, and was very tired. She did not seek any counseling or medical treatment.

At the request of Kamrath's counsel, Dr. John Curran, a psychiatrist, met with Kamrath three times in late 1983 and early 1984. Dr. Curran testified that he was initially skeptical that a polygraph test could have such a strong effect on anyone. However, after meeting Kamrath, he decided she suffers from post-traumatic stress syndrome. Dr. David Lykken, a professor of psychiatry and psychology, testified that someone with Kamrath's structured religious socialization, with a strong moral code emphasizing honesty, could react more strongly than an average individual. To Kamrath the mere request of a test was an accusation of dishonesty. The polygraph examiner pressured her to reveal any acts of dishonesty in her life. As a child, Kamrath had stolen change from her father, which she had never admitted to anyone and refused to tell the examiner.

At the first interview with Dr. Curran, Kamrath was still very embarrassed to talk about her nightmares. She testified that Lyng told her, at the time of the test request, that the matter was confidential. Dr. Curran noted that as a result Kamrath did not talk to many people about the test, thus denying herself the comfort of letting out her feelings and being assured that anyone would be upset in that situation. Dr. Curran concluded Kamrath has a 15% permanent emotional disability based on (1) her emotional inability to work at any job involving handling money, and (2) her increased dependence on her husband, resulting from her inability to express her feelings and develop close relationships with others.

After trial the jury found that the bank made the test request, that this conduct directly resulted in damages to Kamrath, and that $60,000 would fairly compensate her. The trial judge later determined that reasonable attorney's fees for Kamrath's counsel were $30,000. The court denied Suburban's motions for judgment notwithstanding the verdict, a new trial, or remittitur.

Kamrath has requested permission to file a reply to Suburban's reply brief.

## ISSUES

1. Did the trial court err by refusing to submit to the jury the question of whether the bank acted as an agent of the police in requesting the polygraph, or by refusing to grant a new trial or j.n.o.v. on those grounds?

2. Did the trial court err in refusing to instruct the jury on the elements of intentional infliction of emotional distress?

3. Did the trial court err in failing to grant remittitur?

4. Was the trial court's assessment of $30,000 in attorney's fees clearly erroneous?

## ANALYSIS

■ 1. Minn.Stat. § 181.75, subd. 1 (1984) states that:

No employer or agent thereof shall by directly or indirectly solicit or require a polygraph, voice stress analysis, or any test purporting to test the honesty of any employee or prospective employee.

Suburban argues that if it asked Kamrath to take the test, it did so only as the agent of the Eden Prairie police. The bank suggests this should be an exception to the statute.

The trial court refused to submit the agency issue to the jury, or grant a j.n.o.v., because the evidence at trial did not support that theory. Implicit in and essential to the agency theory is an admission that the bank did make the request. Both Lyng and the president of the bank, Roy Terwilliger, testified that they did not know of the tests until after they occurred. The jury heard Sgt. Bridger's testimony that he set up the exams and must have made the request. He testified that to the best of his knowledge no one else made a request. The jury apparently believed Lyng made an additional request, independent of the police.

The statute formerly read "shall be direct or indirect coercion request or require." Minn.Stat. § 181.75 (1974) (amended in 1976). In eliminating the word coercion from the statute, the legislature broadened its effect. *State v. Century Camera*, 309 N.W.2d 735 (Minn.1981). In *Century Camera* the court noted that "an element of coercion is nevertheless implicit in the statute as it now reads because of the unequal position of an employee vis-a-vis an employer." *Id.* at 741. The court found a substantial state interest in prohibiting the requests. Among the stated concerns were encouraging a harmonious atmosphere in employer-employee relations, pro-

tecting employees' expectations of privacy, discouraging practices which may demean an individual's dignity, protect employees from adverse inferences should they refuse the test, and avoid "the coercive impact present in the solicitation." *Id.* at 743. It seems clear that the legislature meant to prohibit any requests from the employer, on behalf of anyone, to take a polygraph test, because the employee will inevitably feel coerced.

■ Suburban also questions the court's instruction which failed to define "solicit." The court used the exact words of the statute. Further definition might not be accurate. Suburban's desired definitions of "beseech" and "ask earnestly" are more forceful terms. The legislative amendment dropping the word coercive as a modifier of request indicates a broader interpretation.

■ 2. The trial court refused to submit the elements of intentional infliction of emotional distress, as set forth in *Hubbard v. UPI*, 330 N.W.2d 428 (Minn.1983), or to grant a new trial on that ground. Suburban argues that without a physical injury Kamrath must meet the requirements of *Hubbard* to recover. In a well-written memorandum, the trial court properly determined that *Hubbard* applies only to those cases where there is no independent underlying tort or cause of action.

Traditionally a plaintiff is not entitled to damages for mental distress without a physical injury unless there is some conduct constituting a direct invasion of her rights, such as slander, libel, malicious prosecution, willful, wanton or malicious misconduct. *State Farm Mutual Auto Insurance Co. v. Village of Isle*, 265 Minn. 360, 367, 368, 122 N.W.2d 36, 41 (1963). *Hubbard* recognizes the independent tort of intentional infliction of emotional distress and adopts elements intended to ensure that a tort actually occurred and that injury was intentionally inflicted. *Hubbard*, 330 N.W.2d at 438, citing *State Farm*.

Here there is an underlying cause of action, a violation of Minn.Stat. § 181.75,

subd. 1. The statute prohibits acts of the same character as those listed in *State Farm.* Any violation may result in a "civil action to recover any and all damages recoverable at law." Minn.Stat. § 181.75, subd. 4. As with the torts enumerated in *State Farm,* harm of the type Kamrath suffered, based in emotional distress, flows naturally from the act constituting the underlying tort.

3. The jury as fact-finder determined Kamrath suffered $60,000 in damages. The judge refused to grant remittitur, stating that the uncontradicted medical evidence indicated Kamrath suffered from post-traumatic stress syndrome with a permanent emotional disability.

▉ The question of whether a jury award is excessive is resolved on the facts of each case. *Sorenson v. Kruse,* 293 N.W.2d 56, 63 (Minn.1980). The trial court's judgment regarding remittitur is entitled to great deference when the court carefully examines the verdict and explains its decision. *Id.* at 62. If these requirements are met, the trial court's determination will be reversed only where there is a clear abuse of discretion. *Nelson v. Nelson,* 283 N.W.2d 375, 379 (Minn.1979).

▉ There is sufficient evidence to support the verdict. Kamrath's counsel did a commendable job of portraying her structured upbringing, and convincing the jury that Kamrath could react this strongly to the test, even if other people might not. Appellant did not produce any medical evidence to contradict Dr. Curran.

4. The statute allows plaintiffs to recover:

> any and all damages recoverable at law, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court.

Minn.Stat. § 181.75, subd. 4. Kamrath's attorney requested $147,202.74 in fees. The trial court granted $30,000, having considered the factors enunciated in *City of Minnetonka v. Carlson,* 298 N.W.2d 763, 766, 767 (Minn.1980), as well as the trial court's own sense of what was fair under the circumstances.

This court has said:

> The reasonableness of attorney's fees "is a fact to be determined by the evidence submitted, the facts disclosed by the record of the proceedings, and the court's own knowledge of the case." *State v. Paulson,* 290 Minn. 371, 373, 188 N.W.2d 424, 426 (1971). A trial court's findings on the issue of attorney's fees should be upheld unless clearly erroneous.

*Katz and Lange, Ltd. v. Buegen,* 356 N.W.2d 733, 735 (Minn.Ct.App.1984).

▉ The provision for attorney's fees in section 181.75 indicates this is a private attorney general statute. *See* Minn.Stat. § 8.31, subds. 1 and 3a (1982). Therefore there are additional appropriate considerations in fee decisions, such as eliminating financial barriers to vindicating a plaintiff's rights and the extent to which the public interest is advanced by the suit. *Liess v. Lindemyer,* 354 N.W.2d 556, 558 (Minn.Ct.App.1984). As discussed above, the legislature and the supreme court have shown a strong public interest in barring employer requests for polygraphs from employees.

▉ The trial judge closely scrutinized the fee request, and reduced it. His finding is supported by the many documents submitted by respondent's counsel. Given the trial court's close involvement with the trial, the superior position of the trial court in evaluating the necessary work, and the discretion granted to the judge because of these factors, the decision is not clearly erroneous.

### DECISION

Kamrath's request to file a reply to Suburban's reply brief is denied. The trial court is affirmed in all respects.

Affirmed.